Filed 12/17/13  P. v. Jones CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037699 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS102654) |
| v. | |
| JOE DENNIS JONES, | |
| Defendant and Appellant. | |

Defendant Joe Dennis Jones was convicted after a court trial of forcible rape (Pen. Code, § 261, subd. (a)(2))[1] and forcible oral copulation (§ 288a, subd. (c)(2)).  He was sentenced to 16 years in prison.

On appeal, defendant contends that (1) the trial court "misunderstood" and "misapplied" the mistake of fact defense regarding consent; (2) his trial counsel was prejudicially deficient; (3) there was insufficient evidence of force or fear to support his conviction for forcible oral copulation; and (4) the no-contact order must be stricken.  We agree that the no-contact order must be stricken but reject defendant's other contentions.  We modify and affirm the judgment.

---

[1]     Further statutory references are to the Penal Code unless otherwise noted.

## I. Background

Defendant was 51 in 2009, and he had owned Joe's Furniture store in Salinas for four or five years. He had no employees but "[o]ccasionally" hired people to help out.

Jane Doe 1 was on her way to school when she ran into defendant at the bus station near his store on December 8, 2009. She had met him "five or six years" earlier, when she was 17, but had not seen him since then.

Defendant gave Jane Doe 1 his business card and asked if she had her high school diploma or GED. When she replied that she was "working on it," he told her, "[w]hen you have it, come see me."

She did not plan to go to defendant's store that afternoon. She was around the corner from the store around 4:00 p.m., walking home from school, listening to music on her phone, and not paying attention, when defendant tapped her on the shoulder and asked if she remembered him. She said she did, because he had given her a business card that morning. She went to his store with him, believing that she was going to start work that day. She had never been inside the store before.

Defendant showed her around the store "and he talked to me a little bit about the job." He showed her how to build a table. "And he asked me if I had ever done it before, and I said no, sir, I specialize in restaurant and hospitality."

There was no one else in the store. Defendant told Jane Doe 1 she could make "really good money" by traveling with him everywhere. He said he believed she was a prostitute, and he begged her to take off her clothes. She did not like the way he was talking to her. "It was disrespectful." She told him "many times" that she did not want to take off her clothes but he "laughed in my face." He wanted to have sexual intercourse with her, and when she told him she did not want sexual contact, "[h]e didn't care. He laughed in my face." Defendant "tried to remove [her] clothes," took off her pants and underwear, and "told me . . . I couldn't stop doing what he asked me to do until he was happy and pleased." He told her not to tell anyone because he had just gotten out of

2

prison "for the exact same thing, and he was scared that if I said anything that he would go back."

Jane Doe 1 was "afraid, very afraid" that defendant was going to hurt her. "I was afraid that I would never get out of there, and I was also afraid that he was going to keep me there all night until he was really really happy, whatever. Or he could have killed me . . . . And I was looking around to see if there was like any weapons around . . . ." She kicked defendant in the leg but that did not stop him. He did not hit her, but he grabbed her "really hard" by her waist and by her arm. She could not leave because "[t]he whole building was locked." Defendant had told her he was going to lock all the doors and all the windows so that no one could enter. She saw him lock the doors with a key, and she heard him close and lock the windows "the way you have to lock [them] when you're locking up a business." "And then he put the keys away . . . ."

Defendant "forced" her to open her legs, "and I wouldn't let him." "I didn't want to, but I only did it because I was afraid of what was going to happen next." The assault started "[o]n top of his disgusting dirty desk." "After he got tired of the unsanitized desk, he took me to the rest room. . . . [T]hat didn't work out, and then he tried the desk again. He wasn't succeeding after three or four times, [so] then he tried the bed." She was "screaming." Every time he tried to put his penis in her vagina, she told him it hurt. He told her "to open up wider, that he knew what he was doing." "As soon as you give me what I want," he said, "I'll let you go."

Defendant put his penis in her vagina "[o]ver five, six times." He put his fingers in her vagina, "to try to open me up." "At one point, he . . . told me just suck 'em up" and "[t]hat it would satisfy him." She told him she did not want to do that. But "that's what I end[ed] up doing so I could make it out alive. I was scared out of my mind" because "he's a bigger man and he's older and . . . something like this happened to me as a child."

3

Jane Doe 1was in defendant's store for a couple of hours.  Around six o'clock, he "opened the door with the key" and she "ran out."  Defendant warned her "to be quiet, not to say anything or else he knew where to find me."  She reported the assault the next day.  She did not report it immediately because "I felt like I was going to break down, have an anxiety [attack] and seizure.  And if I did that, I wouldn't be able to speak during that time period.  So I waited until the next day."

Salinas Police Officer Enrique Espino took Jane Doe 1's statement, then contacted defendant at his store.  Defendant told Espino that he did not know Jane Doe 1, did not recall her coming into the store about a job, and did not know why somebody was accusing him.  Espino did not arrest defendant.

Jane Doe 2 lived near defendant's store in 2010 and had seen him "a few times" in front of it.  On July 6, 2010, he asked her if she was looking for a job.  When she said she was, he invited her in "to further discuss the details."  Over the next half hour, he asked her if she was bilingual and she said she was.  He asked about her education and told her to return at 5:30 p.m. "to interpret for customers that were supposed to be there later on in the evening."

She returned at the appointed time, "looking forward to getting a job."  Defendant and another man were there, and both were drinking alcohol.  There was no one else in the store.  Defendant gave her $50 when she arrived.  She thought it was payment for the translating she had come to do.

The men asked Jane Doe 2 to dance for them.  She "didn't know what to do" so she danced for "maybe a minute."  It was not a provocative dance.  She sat down on a couch some distance away.  She was "nervous" and did not feel that she was free to leave.  She "didn't feel very safe," but "didn't know how to feel at the time."  She has schizoaffective disorder and had not been taking her medication.  She hears voices when she is not taking her medication, and that "disrupts [her] thinking."  She "wasn't fully comprehensive of what was going on" that evening.

4

Jane Doe 2 was wearing a long sleeved black shirt and a knee length skirt. Defendant asked her to take the skirt off. She did not want to do that and "told him that I wasn't sure if I wanted to do that." She also told him she was "uncomfortable" about that, but he "kept insisting." She said, "I don't think I want to do that." When asked if she told him to stop, she responded, "Not clearly." "I said I was uncomfortable with it." She felt "very nervous" because she "was receding back into certain points in my life where I had been abused, and it felt like I was back in that point in my life."

Defendant took off Jane Doe 2's skirt. She "resisted a little bit" but "gave up saying no" and "just let him do it." He "walked [her] over to the ottoman." She did not want to do that but cooperated "because by that time I was very nervous and I could sense that something else was going to happen. But I really didn't know what to do because, like I said, I was receding to a certain point in my life where I had already been abused and didn't know what to do." Defendant removed her underwear. She did not recall saying anything. She was "just in a state of shock and wasn't resisting." She was not afraid "[b]ecause I was just in a state of shock. I didn't know what to do."

Defendant put his fingers in her vagina "forcefully," which caused her pain. He "t[old] his friend to have sex with [her]," and the friend did so. Defendant was "right next to" her at the time, "and he had removed his pants also." He tried to put his penis into her vagina but was unable to get an erection. "So then his friend had sex with me again, and then [defendant] wanted me to have fellatio with him" at the same time. She did not want to do that, but did not tell him no. She was fearful because "there were two men abusing [her]" and she "did not know what was going to happen next." She "never felt like [she] had a choice," because of how the men were positioned. Defendant was "hover[ing] over" her, demanding fellatio. She orally copulated him for "about a minute or so" while the other man raped her. Neither man ejaculated. Defendant removed his penis from her mouth, pulled up his pants, and told her she could get dressed. She "just

5

wanted to leave, so I let him kiss me and I . . . just went home, cried." She did not return the $50 "because I was in such a state of shock and anguish that I left in a rush."

Jane Doe 2 went home and cried for about an hour. She was "afraid and ashamed" to tell anyone what had happened and worried that people might view her in a negative way. She had a medical exam "probably about the following week." Two weeks after the assault, she went to the police because she "couldn't stand the thought that . . . this could happen to other women later."

Officer Lek Livingston interviewed Jane Doe 2 on July 19, 2010. She told him she had gone to defendant's store for a job interview.

Detective Danny Warner interviewed defendant on December 2, 2010. When he showed defendant a photograph of Jane Doe 2, defendant claimed not to recognize her. "[A] lotta people come by my store," he told Warner, "and they're [*sic*] been a lotta accusation[s]." "[O]ne of the accusations is somebody say I touched her." "That was July." Defendant told Warner many people came by his store looking for jobs. "[S]he looks familiar," he said, "like several different people've [*sic*] been by my store." When Warner asked him if he had sexual contact with Jane Doe 2, defendant responded, "Not that I can remember." He said that he had not been sexually involved "for a while." "I've heard most of these questions before," defendant asserted. "I denied 'em then, [and] I deny 'em now."

Defendant was arrested. He was charged by information with seven felony counts: two counts of forcible rape (§ 261, subd. (a)(2)), forcible oral copulation (§ 288a, subd. (c)(2)), and forcible sexual penetration by a foreign object (§ 289, subd. (a)(1)) arising out of the December 8, 2009 incident with Jane Doe 1, and forcible rape while acting in concert (§ 264.1), forcible rape (§ 261, subd. (a)(2)), and forcible oral copulation (§ 288a, subd. (c)(2)) arising out of the July 6, 2010 incident with Jane Doe 2. He waived his right to a jury trial in exchange for a "negotiated court trial" in which he could be convicted on only two counts, one for each victim.

6

Both victims testified at trial. Detective Warner authenticated the videotape of his interview with defendant, and it was played for the trial court. Sexual assault response nurse Kristin Bakhda testified that she examined Jane Doe 1 on December 10, 2009. As is "[v]ery often" the case, the external exam revealed no physical injuries. Jane Doe 1 refused to have an internal exam, a common occurrence in Bakhda's experience when victims are uncomfortable or nervous or scared. Bakhda found the exam "very consistent" with Jane Doe 1's report of having been penetrated by a penis and a finger and forced to orally copulate her assailant.

After the People rested, the defense moved for a judgment of acquittal (§ 1118), arguing that Jane Doe 1's testimony was "surreal and inconsistent" given that the police had investigated her allegations in 2009 and "determined that [they] didn't have a case to file . . . ." Jane Doe 2, the defense argued, "never told [defendant] no" and "never tried to stop what was going on," so defendant "didn't have any knowledge that she wasn't consenting."

The prosecutor countered that there was "more than sufficient evidence to deny the 1118" with respect to both women. They did not know each other, yet both said "the same thing." Both had been enticed to enter the store on the promise of a job. "[T]he circumstances of the rape, the fact he had some difficulty as far as with an erection," were similar. The relevant inquiry with respect to Jane Doe 2, the prosecution asserted, was whether she was subjectively afraid and whether her fear was reasonable under the circumstances, which it was. She had gone to the store "supposedly for a job offer." She was in an isolated area with two men, both strangers and both larger than she was, "[s]o it doesn't take a genius to see . . . with two men, who are now at this point saying very odd things to her, like dance for me, pulling on her clothes, walking her over to the [ottoman], that she has a choice. She could be raped or she could be dead."

The trial court denied the motion. "But for the ruse to get the women -- and I'll direct my comments to Jane Doe Number Two -- into the store," the court explained, "I

7

think [the defense] argument would be plausible, and I think the defendant would be acquitted. [¶] However, the manner in which the defendant enticed Jane Doe Number Two and Jane Doe Number One into the store, leads me to believe that he did not have any credible belief that these women came to his store to engage in sexual conduct with him willingly. [¶] Consequently, the 1118 motion is denied."

Defendant testified in his own behalf and denied luring either victim into his store. He told the court that Jane Doe 1 had been coming by the store looking for work "on a monthly, if not weekly, basis" for five years. "She's always asking for a job." "I'm always telling her no." She offered him "sexual favors" on December 8, 2009 and he "said no." He gave her $20 because she said she needed help, and she left. She returned the next day with a friend, threatened to go to the police "if I didn't give her a job," and "left angry."

Defendant insisted that he had no sexual contact with Jane Doe 1. He did not touch her in a sexual manner in any way. He did not lock the windows or the doors, which "don't have keys" and "are not able to be locked."

Defendant told the court that Jane Doe 2 rode her bike by his store on July 6, 2010, and asked if he had any work for her. When he said he did not, she looked around the store, said she had to go home, and left. He did not ask her to return, tell her he might have work for her, or intend to hire her, and he was "quite surprised" when she returned that afternoon and said she was there to work. He and another man, whose name he did not know, "were sitting there drinking." Defendant told Jane Doe 2 he had no work, and "[s]he said, I danced before, I've had sex with men, and, you know, why don't you think about it." She "said I'll take $50." He gave her $50.

Defendant told the court he had a "health issue" that prevented him from getting an erection. He gave Jane Doe 2 the money because she needed it, and he "thought it was a nice thing to do." He "never even tried" to have sexual intercourse with her. "It was impossible." He did not attempt to put his penis in her vagina. He "[n]ever touched her."

8

Although they talked about fellatio, "[i]t never happened." They had no sexual contact whatsoever.

Asked what happened "when you couldn't have sex" with Jane Doe 2, defendant said that "as always," his phone rang. Jane Doe 2 "looked over at the other guy," who "proceeded towards her" while defendant went behind a counter to answer the phone. Defendant could "barely see over that counter" and did not see what happened. When he finished his phone call, his friend told him, "I couldn't do it either." Neither of them had sexual contact with Jane Doe 2 that day. She got dressed, they kissed, and she left. He did not ask her to return his $50.

In closing argument, the prosecutor stated that defense "counsel had talked about some reasonable belief." "[A]nd the *Dominguez* case . . . , which refers to *Mayberry*, talks about how there are two components to reasonable belief. One subjective, one objective. [¶] Here, since he is denying all sexual contact, obviously it's not going to apply. He also failed on the objective category as well as far as reasonable belief. There is no defense as far as the *Mayberry* instruction."

Defense counsel argued that Jane Doe 1 "didn't have a credible story" and that defendant's "own statement was that he didn't have sex with [her]," so the court "ha[d] to determine who . . . is telling the truth and who isn't and what scenario is truly believable." Jane Doe 2, the defense argued, consented to what happened.

The trial court found defendant guilty of forcible rape with respect to Jane Doe 1 and forcible oral copulation with respect to Jane Doe 2. "I do find the victims' testimony to be credible," the court stated. "As I indicated previously, but for the ruse there would be a failure on the part of the prosecution to prove the defendant did not actually and reasonably believe the women consented. However, that's not the facts before this Court."

The court imposed the upper term of eight years on each count, to run consecutively for an aggregate term of 16 years. The court also imposed a no-contact

9

order as part of defendant's punishment, directing him to "[s]tay at least 100 yards away from [his victims]" and to "[h]ave no direct or indirect contact upon [his] release from the California Department of Corrections and Rehabilitation." The remaining counts were dismissed. Defendant filed a timely notice of appeal.

## II. Discussion

### A. Mistake of Fact Defense

Defendant contends that his convictions "rest upon the court's misunderstanding of the mistake of fact defense regarding consent and how it applies to the facts of this case." We disagree.

A reasonable and good faith but mistaken belief that a person consented to sexual intercourse is a defense to rape. (*People v. Mayberry* (1975) 15 Cal.3d 143, 153-158 (*Mayberry*).) "The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361.) The objective component "asks whether the defendant's mistake regarding consent was reasonable under the circumstances." (*Id.* at p. 361.)

Defendant asserts that the trial court "misapplied" the *Mayberry* defense, as evidenced by its pre-verdict comment that " 'but for the ruse, there would be a failure on the part of the prosecution to prove the defendant did not actually and reasonably believe the women consented.' " He argues that his use of a ruse was "irrelevant" because it had "no bearing on whether [he] actually and reasonably believed the women consented to the sexual acts" that occurred. "Accordingly," he maintains, "the court should have found [him] not guilty of rape and forcible oral copulation because he mistakenly and reasonably thought the women consented to the sexual acts." We cannot agree.

10

"[W]here a judge's statements as a whole disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached his determination." (*People v. Cartier* (1960) 54 Cal.2d 300, 313.) "That rule is inapplicable . . . , however, [where] the 'judge's statements as a whole' disclose an incorrect rather than a correct concept of the relevant law, embodied not merely in 'secondary remarks' but in his basic ruling . . . ." (*People v. Ortiz* (1964) 61 Cal.2d 249, 253 (*Ortiz*).) "The oral opinion of the trial court may be used in interpreting the court's action in its decision of the case if it unambiguously discloses the mental processes of the trial judge in reaching his conclusion." (*People v. Butcher* (1986) 185 Cal.App. 3d 929, 936 (*Butcher*).) Where the trial court's statement is ambiguous, however, "we are compelled to indulge in that interpretation that will result in upholding the action of the trial judge as long as that interpretation is reasonable." (*People v. Megladerry* (1940) 40 Cal.App.2d 748, 774, disapproved on another ground in *People v. Simon* (2001) 25 Cal.4th 1082, 1108.)

Contrary to defendant's assertion, the comments that defendant relies on do not "unambiguously" disclose the trial court's mental processes. (*Butcher*, *supra*, 185 Cal.App.3d at p. 936.) It can be inferred from them that the court considered whether defendant might have had a *Mayberry* defense and concluded, based on his use of the ruse, that he did not. But the key issue here—how much weight the trial court gave the ruse evidence—is unclear. Defendant maintains that the comments reveal that the trial court believed his use of a ruse was the only evidence supporting his convictions. But the ruse evidence "d[id] not negate the *Mayberry* defense as a matter of law," he argues, so it was "not probative" on whether he "actually or reasonably believed the women consented to the sexual acts," and the trial court "should not have relied on it exclusively in determining [that his] *Mayberry* defense failed."

The flaw in defendant's reasoning is that the trial court's comments can also be interpreted another way. In our view, they can reasonably be understood to mean that the

11

ruse evidence informed the court's consideration of the other evidence adduced at trial. When the totality of the evidence was viewed in light of the ruse, the balance tipped against a finding that defendant believed both victims consented. The ruse evidence, in other words, gave the trial court a context in which to view testimony that might otherwise have supported a claim that defendant actually and reasonably, albeit mistakenly, believed both victims consented.

By providing a plausible explanation why both victims went to defendant's store, for example, the ruse evidence undermined defendant's testimony that both offered him "sexual favors." The ruse evidence also put Jane Doe 2's acceptance of $50 from defendant into context. It undermined his argument that she consented and instead supported her testimony that she returned to the store to interpret for customers and accepted the money as payment for the translating she had come to do. The ruse evidence bolstered both victims' credibility, not only with respect to their reasons for going to defendant's store, but overall. By bolstering the victims' credibility, the ruse evidence necessarily undermined defendant's credibility. The fact that the victims did not know each other but both told similar stories further undermined his credibility.

Where sharply conflicting testimony permits an inference that one or more witnesses deliberately lied about something significant in a case, the trier of fact may consider not believing anything that witness said. (*People v. Lang* (1989) 49 Cal.3d 991, 1024; CALCRIM No. 226.) Or, if the trier of fact thinks the witness lied about some things but told the truth about others, it may simply accept the part that it thinks is true and ignore the rest. (CALCRIM No. 226.) Here, the trial court could reasonably have concluded, after viewing all of the testimony in light of the ruse evidence, that defendant had not satisfied either the subjective or the objective component of the *Mayberry* defense. The court's comments are thus entirely consistent with its ruling. Because "the 'judge's statements as a whole'" do *not* "disclose an incorrect rather than a correct

12

concept of the relevant law," we will not use them to overturn the court's correct application of the law. (*Ortiz*, *supra*, 61 Cal.2d at p. 253.)

## B.  Ineffective Assistance of Counsel

Defendant contends that his trial counsel was prejudicially deficient in failing to object to the court's misapplication of the law.  We disagree.  Since we have determined that the trial court did not err, an objection would have been meritless.  "Representation does not become deficient for failing to make meritless objections." (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

## C.  Claimed Insufficiency of the Evidence

Defendant contends that there was insufficient evidence of force or fear to support his conviction for forcible oral copulation.  We disagree.

When a defendant challenges the sufficiency of the evidence to support a conviction, " ' ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] . . . [W]e ' "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

Section 288a defines forcible oral copulation as "an act of oral copulation . . . accomplished against the victim's will by means of force, violence, duress, menace, or

13

fear of immediate and unlawful bodily injury . . . ." (§ 288a, subd. (c)(2)(A).) Because these terms are listed in the disjunctive, a "conviction may be upheld if there is substantial evidence [that] the act was accomplished against the victim's will *either* by force, violence, duress, menace, *or* fear of bodily harm." (*People v. Hale* (2012) 204 Cal.App.4th 961, 976 (*Hale*).)

"'[F]orce'" in the context of rape is "'physical force of a degree sufficient to support a finding that the act . . . was against the will of the [victim].'" (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1024 (*Griffin*).) "As reflected in the surveyed case law, in a forcible rape prosecution the [trier of fact] determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. The Legislature has never sought to circumscribe the nature or type of forcible conduct that will support a conviction of forcible rape, and indeed, the rape case law suggests that even conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction. [Citation.] Nor has the rape law ever sought to quantify the amount of force necessary to establish the crime of forcible rape . . . ." (*Griffin*, at p. 1027.) "'"*The kind of physical force is immaterial*; . . . it may consist in . . . laying hold of and kissing [the victim] against her will.'"' [Citations.]" (*Griffin*, at p. 1024.)

"These concepts apply equally to the crime of forcible oral copulation. . . . As with forcible rape, the gravamen of the crime of forcible oral copulation is a sexual act accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury. As with forcible rape, it is only when one participant in the act uses force to commit the act against the other person's will that an otherwise lawful act becomes unlawful." (*People v. Guido* (2005) 125 Cal.App.4th 566, 576.)

14

We find sufficient evidence of force here. Jane Doe 2 testified that defendant "moved me over to" and "walked me over to" to the ottoman. Later, she testified that she "was walked" to the ottoman and "was laid down on it." Her choice of words belies defendant's assertion that she proceeded to the ottoman "based on her own free will" and suggests instead that she was forced against her will to do so. Nor does the evidence support a conclusion that she freely orally copulated defendant. She testified that while she was on her back on the ottoman and while defendant's friend was raping her, defendant "hovered over" her, demanded fellatio, and put his penis in her mouth. She did not want to orally copulate him but felt she had no choice because of how the two men were positioned. She was pinned down, in short, just as the victim in *Griffin* was pinned down. (*Griffin*, *supra*, 33 Cal.4th at p. 1029 [jury "could reasonably infer that by pinning her arms to the floor, defendant was able to achieve penetration . . . without [the victim's] consent"].)

We do not find it significant that Jane Doe 2 was pinned down by defendant's friend rather than by defendant himself, since the evidence established that defendant "t[old] his friend to have sex with [her]" and then took advantage of her defenseless position while the friend did so. Nor are we persuaded by defendant's argument that Jane Doe 2 "never used the word[s] 'pinning' or 'trapped.'" On this record, she did not need to, because her description of events allowed no other conclusion. The trial court could reasonably have determined that "the use of force served to overcome [Jane Doe 2's] will . . . to thwart or resist the attack." (*Griffin*, *supra*, 33 Cal.4th at p. 1027.) Thus, sufficient evidence of force supported defendant's conviction for forcible oral copulation.[2]

---

[2] Because we conclude that sufficient evidence of force supported defendant's conviction for forcible oral copulation, we need not address whether that conviction was also supported by sufficient evidence of fear of immediate and unlawful bodily injury.

15

## D. No-Contact Order

Defendant contends, and the Attorney General concedes, that the no-contact order must be stricken because it was not authorized by section 1202.05 or any other statute. We agree.

"A claim that a sentence is unauthorized . . . may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court." (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6.) "Although the cases are varied, a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354.)

Here, the probation report recommended and the trial court imposed a no-contact order as part of defendant's punishment. The order was of indefinite duration. It required defendant to "have no contact with the victims," to "[s]tay at least 100 yards away from them," and to "[h]ave no direct or indirect contact upon your release from the California Department of Corrections and Rehabilitation." The statutory basis for the order was not specified.

"The imposition of sentence and the exercise of sentencing discretion are fundamentally and inherently judicial functions." (*People v. Navarro* (1972) 7 Cal.3d 248, 258.) But " 'the power to define crimes and fix penalties is vested exclusively in the legislative branch.' " (*People v. Tanner* (1979) 24 Cal.3d 514, 519, fn. 3.) "Penal Code section 12 imposes a duty upon the sentencing court to impose the punishment prescribed by law. [Citation.] A sentencing court has no discretion to deviate from the punishment prescribed by statute." (*People v. Lara* (1984) 155 Cal.App.3d 570, 574.)

Here, neither the probation report nor the trial court listed a statutory basis for the no-contact order. The Attorney General concedes, and we agree, that there is none.

16

Section 1202.05 "authorizes courts to prohibit visitation between a defendant sentenced to state prison and the child victim." (*People v. Gerber* (2011) 196 Cal.App.4th 368, 391.) But the victims here were adults. "Nothing in the legislative history suggests any intention or expectation that [section 1202.05] would affect visitation between adult victims and their childhood abusers. On the contrary, the Legislature clearly contemplated that only children would be affected. It follows that the restrictions on visitation imposed by [section 1202.05] apply only to victims who are under the age of 18 at the time of the contemplated visitation." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1323.)

Other statutes authorize the issuance of no-contact orders in certain situations, but none of those statutes applies here. A trial court may impose a no-contact order as a condition of probation, for example. (§ 1203.1, subd. (i)(2); *People v. Robertson* (2012) 208 Cal.App.4th 965, 996.) But the court denied probation in this case. Section 136.2 authorizes no-contact orders to protect witnesses and victims during the pendency of a criminal proceeding, but except in domestic violence cases, it requires a showing of a good cause belief that harm or intimidation of a witness or victim has occurred or is reasonably likely to occur. (§ 136.2, subd. (a); *Babalola v. Superior Court* (2011) 192 Cal.App.4th 948, 960-964.) No such showing was made here.

Nor does the trial court's inherent power justify imposition of a no-contact order. The court rejected such a contention in *People v. Ponce* (2009) 173 Cal.App.4th 378, explaining that "[a]n existing body of statutory law regulates restraining orders. '"[I]nherent powers should never be exercised in such a manner as to nullify existing legislation . . . ."' [Citation.] Where the Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives. [Citation.]" (*Id*. at p. 384.)

We conclude that the no-contact order must be stricken.

17

### III.  Disposition

The judgment is modified to strike the provision that defendant have no contact with his victims.  As modified, the judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Márquez, J.

18