Filed 2/18/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JEANETTE SONJA TESSMAN,<br><br>    Defendant and Appellant. | D062372<br><br><br><br>(Super. Ct. No. SCN299533) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry Mark Elias, Judge.  Affirmed as modified.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

Jeanette Sonja Tessman appeals the order granting her five years of formal probation after the trial court conducted a bench trial and found her guilty of one count of

residential burglary (Pen. Code, §§ 459 & 460, subd. (a))[1] and one count of commercial burglary (§ 459). Tessman contends the residential burglary conviction must be reversed because the building she entered was not an inhabited dwelling house at the time of the entry, and the commercial burglary conviction must be reversed because the conviction might have rested on a legally incorrect theory of guilt. We reject Tessman's substantive contentions. Accordingly, we affirm as modified.[2]

## FACTUAL BACKGROUND

A.    *The Residential Burglary*

On February 6, 2011, real estate agent Janet Taylor held an open house at a residence owned by Jennifer Johns in Carlsbad. Johns had all her belongings in the house and slept there the nights before and after the open house. During the open house, Johns was not at home.

Tessman went to the open house and chatted with Taylor for a few minutes. Tessman then removed her shoes, walked into the kitchen, looked it over for 15 to 20 seconds, and asked Taylor if she could go upstairs. Taylor gave permission, and Tessman walked up the stairs.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    At Tessman's sentencing, the trial court orally imposed as a condition of probation a prohibition on entering any pawn shop *unless* permitted by Tessman's probation officer. However, the trial court's written probation order simply prohibits Tessman from entering any pawn shop. Tessman requests, and the People do not oppose, that the written order granting probation be corrected to conform to the conditions orally imposed by the trial court. We grant Tessman's request. (See *People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2.)

After Tessman went upstairs, Taylor developed a feeling that something was wrong. Taylor ran up the stairs and heard a noise that sounded like metal pieces clinking together. She saw Tessman in the master bathroom standing over a jewelry box with her hand on something. Taylor asked, "What are you doing?" Tessman replied, "Oh, I just like to look at things"; she then shrugged and smiled. Taylor told Tessman she needed to leave and escorted her out of the house.

After Tessman had departed, Taylor telephoned Johns to report that Tessman had gone through some things in the master bathroom. When Johns returned home after the open house, she discovered some rings and a necklace were missing from her jewelry box.

B.      *The Commercial Burglary*

Vihra Marinova held open houses at her home in Carlsbad in January and February 2011. During that time period, five gold necklaces were taken from her jewelry box. Marinova reported to police that the items had been stolen and provided descriptions and drawings of the items.

On January 30, 2011, Tessman entered a pawn shop and sold three necklaces. The shop forwarded information about its purchases from Tessman to the local police department.

After receiving information about the necklaces Tessman had sold to the pawn shop, police contacted Marinova and urged her to go to the pawn shop because one of the necklaces appeared very similar to a necklace Marinova had reported stolen. Marinova

went to the shop, identified the necklace as hers, and purchased it.

Police subsequently contacted Tessman as part of an investigation into jewelry thefts in Carlsbad. Tessman admitted she had attended open houses in Carlsbad and had looked through jewelry boxes in the homes she visited, but she denied ever taking anything. Tessman also admitted she had pawned some pieces of jewelry, but claimed a former employer had given the jewelry to her between 1998 and 2002.

## DISCUSSION

Tessman challenges both of her burglary convictions. She argues the residential burglary conviction must be reversed because at the time she entered Johns's house, it was not an "inhabited dwelling." (§ 460, subd. (a).) Tessman contends the commercial burglary conviction must be reversed because the trial court might have found her guilty on the basis of a legally incorrect theory. As we indicated at the outset, we reject Tessman's challenge to both convictions.

A. *The Residential Burglary Conviction Was Proper Because Johns's Home Was an Inhabited Dwelling House*

Tessman contends the trial court erred by finding her guilty of residential burglary because she "entered a property which was open to the public for the commercial purpose of showing the home for sale. The owner of the home was intentionally absent during the open house. The house was not used for dwelling, but as a product for sale." We disagree.

To determine whether Tessman was properly convicted of residential burglary, we

4

look first to the statutes defining that offense. "Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) Burglary of an "inhabited dwelling house" is burglary of the first degree. (§ 460, subd. (a).) As used in section 460, "'inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459.) Here, Tessman does not dispute she had an intent to steal when she entered Johns's home. Rather, Tessman argues she should not have been convicted of residential burglary because the home was not an "inhabited dwelling house" when she entered it.

Case law has defined what constitutes an "inhabited dwelling house" within the meaning of the burglary statutes. "[C]ourts have explained that the term 'inhabited dwelling house' means a 'structure where people ordinarily live and which is currently being used for dwelling purposes.'" (*People v. Cruz* (1996) 13 Cal.4th 764, 776 (*Cruz*).) The term "has been analyzed in terms of whether the dwelling was being used as a residence." (*Ibid.*) Factors relevant to determining whether a house is "inhabited" include whether the owner or occupant sleeps in the house, keeps personal belongings there, and intends to continue living there. (*People v. Hughes* (2002) 27 Cal.4th 287, 354-355; *People v. Aguilar* (2010) 181 Cal.App.4th 966, 971-972 (*Aguilar*); *People v. Hernandez* (1992) 9 Cal.App.4th 438, 442 (*Hernandez*).)

Here, Johns was living in the house when Tessman entered it during the open house. Johns testified: "All my things were in the house. I was staying the night there. I stayed there the night before [the open house]. I came back that night [and] stayed the

5

night there again."  Johns further testified that although the house was for sale and she was not at home during the open house, she did not move out until she sold the house. This testimony established that Johns was using the house as her residence, and it therefore qualified as an "inhabited dwelling house."  (§ 460; see *Cruz*, *supra*, 13 Cal.4th at p. 776; *Aguilar*, *supra*, 181 Cal.App.4th at pp. 971-972; *Hernandez*, *supra*, 9 Cal.App.4th at p. 442.)

Tessman contends, however, that because Johns was not at home and her house was open to the public for sale when Tessman entered and stole the jewelry, the house was not "inhabited."  Our colleagues in Division Three recently considered and rejected a very similar argument in *People v. Little* (2012) 206 Cal.App.4th 1364 (*Little*).  There, Little contended that during an open house held by a real estate agent, "the home was not 'currently being used for dwelling purposes' within the meaning of . . . section 459. Rather, he sa[id], during the open house, the home was being used for exclusively commercial purposes.  Consequently, he contend[ed], he [could not] have committed first degree burglary within the meaning of . . . section 460, subdivision (a)."  (*Little*, at p. 1368.)  In rejecting this argument, the court explained that for purposes of residential burglary, ""'a structure 'need not be occupied *at the time*; it is inhabited if someone lives there, *even though the person is temporarily absent*.' [Citations.]  A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters."'"  (*Id.* at p. 1369.)  Because there was "no dispute that the owners of the home still lived there,

6

even though they were temporarily absent from the home at the time Little entered[,] . . . the home was 'inhabited' during the period of the open house." (*Ibid.*) The same reasoning and conclusion apply here.

Tessman asserts, however, that *Little*'s "reasoning was flawed because the [c]ourt failed to consider the owners['] intended use for the house *at the time of the entry*." According to Tessman, "[b]ecause *Little* ignores the specific commercial purpose of the building during a real-estate open house, it should not be followed." We are not persuaded.

As an initial matter, the flaw Tessman perceives in the *Little* court's reasoning does not exist. The court specifically addressed Little's argument that "during the open house, *the home was being used for exclusively commercial purposes*." (*Little*, *supra*, 206 Cal.App.4th at p. 1368, italics added.) In response, the court held that "simply because a real estate agent was on the premises, that did not turn the residence into an uninhabited commercial property. The residence was still a residence and the homeowners continued to own it. *There is no suggestion that the homeowners in this case had abandoned their home with no intention of returning.* They were just temporarily absent at the time Little was there. They still inhabited the residence within the meaning of the statute." (*Id.* at p. 1370.) Thus, contrary to Tessman's assertion, the *Little* court did consider the owners' intended use of the house at the time of Little's entry.

Furthermore, *Little* is consistent with longstanding California law. As noted earlier, "inhabited" for purposes of section 460 "means currently being used for dwelling

7

purposes, *whether occupied or not*." (§ 459, italics added.) More than 80 years ago, the Court of Appeal rejected an argument that a house was not "inhabited" within the meaning of section 460 simply because the owner and his family who lived there were away at the time of the defendant's entry. (*People v. Allard* (1929) 99 Cal.App. 591, 592.) The *Allard* court stated: "It has never been held that a person loses his residence by reason of a brief absence from the house where he lives, and without evidence of an intention to depart therefrom and go to live in some other place." (*Ibid.*) "Numerous cases following *Allard* have held that a residence is still 'inhabited' for purpose of [section] 460 even though the residents of the house are temporarily away from the premises, where they have indicated no intention to stop living there." (*People v. Guthrie* (1983) 144 Cal.App.3d 832, 838 [collecting cases].) In particular, our colleagues in Division Two have held that a house "is 'inhabited' if it is currently being used for residential purposes, even if it is temporarily *unoccupied*, i.e., no person is currently present. A formerly inhabited dwelling becomes uninhabited only when its occupants have moved out permanently and do not intend to return to continue or to resume using the structure as a dwelling." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 320; accord, *Aguilar*, *supra*, 181 Cal.App.4th at p. 970.) Thus, where, as here, a person is in the process of selling her house and allows interested buyers to inspect it while she is away, as long as "the person is using the structure as a habitation when the burglary . . . occurs, [her] possible intent to abandon the habitation in the future does not alter its character as an inhabited dwelling." (*Villalobos*, at p. 320; see also *Little*, *supra*, 206

8

Cal.App.4th at p. 1369 [home was "inhabited" during open house because owners still lived there even though they were temporarily away].)

Finally, we reject Tessman's argument that since "the open-house environment is much more akin to a commercial situation than a residential one," Johns's home "was not properly considered an 'inhabited dwelling house' during the period when the realtor conducted the open house."  A house that is being used as a dwelling does not lose its character as a dwelling simply because the owner or occupant, or an agent of the owner or occupant, is conducting business in the house at the time the burglar enters.  Tessman's "'position, if adopted, would lead to unintended consequences.  For instance, if a person worked out of his home, the home would be a "business" when the person was working, but a "residence" when the person was taking a break.  Or, a property would lose its residential character every time the maid or gardener was there to work, as long as the homeowner was away.'" (*Little*, *supra*, 206 Cal.App.4th at p. 1370.)  "Interpretations of a statute which would lead to absurd results are to be avoided." (*Villalobos*, *supra*, 145 Cal.App.4th at p. 321.)  We thus conclude the open house did not transform Johns's home from an inhabited dwelling house to a commercial building.

B.    *The Commercial Burglary Conviction Was Proper Even Though the Trial Court Might Have Relied on an Incorrect Legal Theory*

Tessman contends the trial court erred by finding her guilty of commercial burglary because its finding may have been based on a legally incorrect theory.  Specifically, Tessman asserts the court convicted her "because it found that [she] knew *or*

9

reasonably should have known that she carried . . . *stolen* jewelry when she entered a pawn shop to sell it. But a finding that [she] merely *should have known* that the jewelry was stolen does not support a guilty verdict [*sic*]—actual knowledge is required." Like Tessman's contention with respect to her residential burglary conviction, this contention also lacks merit.

1.  *Additional Background*

In finding that Tessman was guilty of the residential burglary, the trial court stated the circumstances surrounding Tessman's conduct at the Johns' open house, the fact that when Johns returned to her home jewelry was missing, and Tessman's admission that she likes to snoop, convinced the trial court beyond a reasonable doubt that when Tessman entered the Johns' home she intended to commit a theft.

With respect to the commercial burglary, Tessman's counsel vigorously argued that Tessman had never been in Marinova's home and, accordingly, there was no evidence that would show she knew the jewelry she took to the pawn shop was stolen. In finding Tessman guilty of commercial burglary, the trial court addressed counsel's argument: "[T]he People are obligated to show to substantiate the burglary by entry into [the pawn shop] . . . that at the time the entry was made [Tessman] *either knew or had reason to know that the necklace or that the property that was pawned was in fact stolen*. And were there, as [defense counsel] says, some other explanation as to how she came into possession of this particular necklace, . . . that then would negate the knowledge element as it relates to that necklace.

10

"Well, it appears to me that during the interview with [the police investigator] and [Tessman], [the investigator] gave [Tessman] an opportunity to explain about the particular items that were pawned because there was a discussion of the pawning . . . . There was discussion of the fact that she had participated in open houses at other locations. One of the locations could include Ms. Johns residence in terms of time frame.

"It's clear that the item pawned, . . . the rose[-]colored necklace belonging to [Marinova]. It was last seen in the possession of [Marinova], I believe on the [second] of January was her testimony. So it could not have been in [Tessman's] possession any time earlier than that, which is how she offered to explain the item she was pawning.

"Therefore, in light of the time frame involved[,] the item last being seen on January 2, pawned on January 30, identified by [Marinova] as being missing in the early part of February, . . . that circumstantially to me demonstrates that when [Tessman] pawned the item, and giving [the police investigator] a statement that's inconsistent with her being in possession of that item in that time frame, is circumstantial evidence to me that she *knew the item or reasonably should have known the item was in fact stolen* beyond a reasonable doubt.

"Therefore, I find [Tessman] guilty of [commercial burglary]." (Italics added.)

2.     *Legal Analysis*

To convict Tessman of commercial burglary, the trial court had to find she entered the pawn shop "with intent to commit grand or petit larceny or any felony." (§ 459.) The trial court's statement of decision indicates it was relying on Tessman's receipt or sale of

11

stolen property as the predicate offense for the commercial burglary charge. A necessary element of that offense is actual knowledge that the property received or sold was stolen. (§ 496, subd. (a); *People v. Vann* (1974) 12 Cal.3d 220, 224; *People v. Rodriguez* (1986) 177 Cal.App.3d 174, 179.) As the People concede, the trial court's remark that Tessman was guilty of commercial burglary because she " 'knew or reasonably should have known' the jewelry was stolen, was . . . only partially correct." Thus, it is possible the trial court found Tessman guilty based on the legally incorrect theory that she reasonably *should have known* the necklace she pawned had been stolen, rather than finding Tessman actually knew the necklace was stolen.

Where a *jury's* guilty verdict may rest on a legally correct theory or a legally incorrect theory, the conviction must be reversed unless the reviewing court can determine from the record that the conviction necessarily rested on the legally correct theory. (*People v. Perez* (2005) 35 Cal.4th 1219, 1233; *People v. Morales* (2013) 212 Cal.App.4th 583, 595.) However, this rule has no application when we review a verdict returned by a trial court sitting without a jury.

As a broad general proposition, cases have stated that a trial court's remarks in a bench trial cannot be used to show that the trial court misapplied the law or erred in its reasoning. (*People v. Grana* (1934) 1 Cal.2d 565, 571; *People v. Simmons* (1971) 19 Cal.App.3d 960, 964; *People v. Tower* (1968) 259 Cal.App.2d 682, 685.) These statements are founded on the principle that, in a criminal bench trial, the trial court is not required to provide a statement of decision and that any explanation of his or her decision

12

a trial judge provides is not part of the record on appeal. (*People v. Grana*, *supra*, at p. 571.)

This broad proposition has been subjected to an important limitation. Without discussing whether a trial judge's statements are part of the record on appeal, cases decided after *People v. Grana* have held that we may nonetheless consider a judge's statement when, *taken as a whole*, the judge's statement discloses an incorrect rather than a correct concept of the relevant law, "embodied not merely in 'secondary remarks' but in [the judge's] basic ruling." (*People v. Ortiz* (1964) 61 Cal.2d 249, 253 (*Ortiz*); see also *People v. Cartier* (1960) 54 Cal.2d 300, 313; *People v. Butcher* (1986) 185 Cal.App.3d 929, 936-937 (*Butcher*); *In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1440.)

We recognize the dissent relies on *Butcher*, *supra*, to support its contention that we must treat the trial court's statements like a jury verdict in cases where the jury has been given alternative theories of guilt, only one which is valid. (Dis. opn., *post*, at p. 2.) This is not an accurate reading of *Butcher*. In considering the impact of the trial court's statement in a bench trial, the court in *Butcher* noted that there is no requirement for findings after a court trial in a criminal case and stated: "Generally, on appeal, statements made by the trial court in the course of trial as to its reasoning are not reviewable. [Citations.] However, there are exceptions to this general rule. In criminal cases an appellate court may take into consideration the '"judge's statements as a whole" [when they] disclose an incorrect rather than a correct concept of the relevant law, embodied not merely in "secondary remarks" but in his basic ruling . . . .' (*People v. Ortiz* (1964) 61

13

Cal.2d 249, 253.)  That is the case here.

"There are compelling indications that the trial court did not pass on the merits of the alternate theory of conviction tendered by the People.  The oral opinion of the trial court may be used in interpreting the court's action in its decision of the case if it unambiguously discloses the mental processes of the trial judge in reaching his conclusion.  [Citation.]  After a review of the entire record and viewing the judge's discussion as a whole, we believe the trial court relied upon an erroneous reading of Penal Code section 484b.  That conclusion precludes the application of the contrary assumption that the court found the defendant was not entitled to recoupment.  [Citations.]  Further, it cannot be the law that a defendant may be convicted in circumstances where the conviction appears to be based upon a legally invalid theory of the law notwithstanding the presence of an alternative valid theory.  (See *People v. Green* (1980) 27 Cal.3d 1, 69; *Street v. New York* (1969) 394 U.S. 576, 587; *Stromberg v. California* (1931) 283 U.S. 359.)"  (*Butcher*, *supra*, 185 Cal.App.3d at pp. 936-937.)

Considered in its entirety, the court's discussion in *Butcher* cannot be interpreted as departing from the general rule that a trial court's statements are not reviewable, subject only to the exception that they may be considered when they *unambiguously* disclose that, in his or her ruling, the trial judge applied an erroneous interpretation of the law.

Thus, if we indulge the more recent and broader view of what we may consider on appeal from a criminal bench trial, the question we face here is whether the admittedly

14

erroneous view of the law expressed by the trial court was merely a secondary remark or one which was unambiguously embodied in the trial judge's ruling. (See *Ortiz*, *supra*, 61 Cal.2d at p. 253; *Butcher*, *supra*, 185 Cal.App.3d at p. 936.) Our reading of the trial court's entire statement of decision convinces us that the trial court's erroneous remark falls into the former category, rather than the latter.

The trial court's statement shows that it considered the two burglaries together, as part of a pattern of conduct, and that with respect to both counts it was focused on whether Tessman in fact stole the respective victim's jewelry. We note that in finding Tessman guilty of the commercial burglary, the trial court expressly relied on the fact that the Johns' open house burglary occurred within the same time frame as Marinova's open house and jewelry loss. The trial court's principal concern with whether Tessman stole the Marinova jewelry is also manifest in its detailed recitation of when Tessman could have had possession of the jewelry, the connection to that loss with the Johns' burglary and the trial court's conclusion that Tessman's explanation of how and when she obtained possession was not credible.

Because the trial court plainly determined that Tessman stole from both victims, the record shows in a fairly unmistakable manner that the trial judge also found that Tessman knew the jewelry was stolen when she walked into the pawn shop. In this context, the trial court's reference to "what she should have known" was nothing more than a secondary slip of the tongue that did not reflect its actual conclusions or reasoning. Thus, assuming the trial court's remarks are subject to review, they do not impeach

15

Tessman's commercial burglary conviction.

## DISPOSITION

The probation order is modified to state, as a condition:  "Do not enter Gems N Loans or any other pawn shop, unless permitted by the probation officer."[3]  As modified, Tessman's convictions are affirmed.


BENKE, Acting P. J.

I CONCUR:

NARES, J.

---

[3]    See footnote 2.

IRION, J.

I concur in the majority's decision to affirm Tessman's residential burglary conviction, but I dissent from their decision also to affirm her commercial burglary conviction. As I read the record and the applicable law, reversal of the commercial burglary conviction is required because the trial court might have found Tessman guilty based upon a legally incorrect theory.

I agree with the majority that the trial court's statement Tessman was guilty of commercial burglary because she knew or reasonably should have known the necklace she sold at the pawn shop was stolen, was incorrect insofar as it assumed constructive knowledge was sufficient for conviction. The offense of selling stolen property, upon which the commercial burglary charge was predicated, requires actual knowledge of the stolen character of the property sold. (Pen. Code, § 496, subd. (a); *People v. Rodriguez* (1986) 177 Cal.App.3d 174, 179.) I also agree with the majority that the following rule applies to jury trials: "[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People v. Green* (1980) 27 Cal.3d 1, 69 (*Green*); accord, *People v. Perez* (2005) 35 Cal.4th 1219, 1233 (*Perez*).) Without citing any authority or providing any explanation, however, the majority asserts the *Green* rule does not apply to criminal bench trials. With this assertion, I disagree.

Although I have found no case from our Supreme Court applying the *Green* rule in the context of a bench trial, the Court of Appeal has done so. In *People v. Butcher* (1986)

185 Cal.App.3d 929, the defendant was convicted in a bench trial of a felony offense. The record indicated that in finding the defendant guilty the trial court relied on an erroneous interpretation of the statute defining the offense, although the record also contained evidence that would have supported the guilty finding under a correct interpretation. (*Butcher*, at pp. 935-937.) Citing *Green*, *supra*, 27 Cal.3d at page 69, the Court of Appeal held "it cannot be the law that a defendant may be convicted in circumstances where the conviction appears to be based upon a legally invalid theory of the law notwithstanding the presence of an alternative valid theory." (*Butcher*, at p. 937.) Moreover, because the *Green* rule implements the important requirements of due process of law (U.S. Const., 14th Amend., § 1) that a guilty verdict rest both on a legally valid theory (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58) and on proof beyond a reasonable doubt of every essential element of the charged offense (*In re Winship* (1970) 397 U.S. 358, 364), the rule must apply whether a criminal defendant is tried by a jury or by a court. Thus, I conclude, in accord with *Butcher*, that where a trial court, in the course of pronouncing a decision finding a defendant guilty, articulates two alternative legal theories of guilt, one correct and the other incorrect, we must reverse the conviction unless we can say "beyond a reasonable doubt" that the court relied on the legally correct theory. (*Chapman v. California* (1967) 386 U.S. 18, 24; see *People v. Swain* (1996) 12 Cal.4th 593, 607 [*Chapman* standard applies when jury is instructed with both correct and incorrect elements of offense]; *People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306 (*Calderon*) [*Chapman* standard applies when prosecutor presents both correct and incorrect theories of guilt to jury].)

2

From the record of Tessman's bench trial, I cannot conclude beyond a reasonable doubt that the trial court relied on the legally correct theory of guilt (i.e., Tessman *actually knew* the necklace she sold at the pawn shop was stolen) rather than the legally incorrect one (i.e., Tessman *should have known* the necklace she sold at the pawn shop was stolen). In announcing its decision on the commercial burglary charge, the trial court stated twice in the span of less than two pages of reporter's transcript that actual knowledge *or* constructive knowledge sufficed for conviction.[1] The only evidence the court cited in support of its finding on the knowledge element was the conflict between Marinova's testimony about when she last saw the necklace Tessman sold at the pawn shop and Tessman's statement to police about when she acquired the necklace. The lack of a credible explanation regarding possession would support an inference Tessman *actually knew* the necklace was stolen. (See *People v. Boinus* (1957) 153 Cal.App.2d

---

[1]     It is unclear how the constructive knowledge standard found its way into the case. Near the beginning of its announcement of its decision on the record, the trial court stated: "I agree with [Tessman's trial counsel] in the sense that the People are obligated to show to substantiate the burglary by the entry into [the pawn shop] that at the time the entry was made [Tessman] *either knew or had reason to know* that the necklace . . . that was pawned was in fact stolen." (Italics added.) Tessman's trial counsel, however, never mentioned the constructive knowledge standard articulated by the trial court. His closing argument mentioned only the actual knowledge standard: "So presumably it's the People's theory that Ms. Tessman committed a burglary because when she sold the jewelry at the pawn shop she *must have known* that it was stolen. Surely it wouldn't be a crime for Ms. Tessman to sell jewelry at a pawn shop, if she *didn't know* that it was unlawfully obtained." (Italics added.) In her closing argument, the prosecutor mentioned neither actual nor constructive knowledge. In reply to the argument of Tessman's trial counsel, the prosecutor argued: "[I]f there had been a lawful explanation there would have been no need [for Tessman] to give this false story that she got [the necklace] from somebody else. It was jewelry that did not belong to her, and she pawned it. That's my theory on count 2."

618, 622.)  But it would also support an inference she acquired the necklace under suspicious circumstances from which she *should have known* it was stolen.  Without a clearer statement of the trial court's reasoning, and in light of its repeated statement that Tessman knew *or* should have known the necklace was stolen, I cannot say beyond a reasonable doubt that the court found Tessman actually knew the necklace was stolen.  Therefore, I conclude Tessman's commercial burglary conviction must be reversed.  (*Perez*, *supra*, 35 Cal.4th at p. 1233; *Green*, *supra*, 27 Cal.3d at p. 69; *Calderon*, *supra*, 129 Cal.App.4th at p. 1306.)

In reaching the contrary conclusion, the majority dismisses the trial court's references to Tessman's constructive knowledge as "nothing more than a secondary slip of the tongue that did not reflect [the court's] actual conclusions or reasoning."  (Maj. opn., *ante*, at p. 15.)  In so doing, the majority tries to bring this case within the rule that "where a judge's statements as a whole disclose a correct concept of the law and its application, no secondary remarks should be deemed to have impeached his determination."  (*People v. Cartier* (1960) 54 Cal.2d 300, 313 (*Cartier*); see *People v. Grana* (1934) 1 Cal.2d 565, 571 [court's quotation of doctrine applicable only to civil case during criminal bench trial did not impeach finding of guilt].)  That rule applies, the majority claims, because the trial court's statement of decision "shows that it considered the two burglaries together, as part of a pattern of conduct, and that with respect to both counts it was focused on whether Tessman in fact stole the respective victim's jewelry."  (Maj. opn., *ante*, at p. 15.)  The majority further claims that "[b]ecause the trial court plainly determined that Tessman stole from both victims, the record shows in a fairly

4

unmistakable manner that the trial judge also found that Tessman knew the jewelry was stolen when she walked into the pawn shop." (Maj. opn., *ante*, at p. 15.) In my view, the record simply will not bear the interpretation the majority puts upon it.

In announcing its decision on the commercial burglary charge, the trial court never said Tessman stole Marinova's necklace. It had no reason to do so, since the offense underlying the burglary charge was selling stolen property, not theft. At trial, the People presented no evidence that Tessman stole Marinova's necklace. Indeed, the detective who testified at trial admitted there was no evidence Tessman had ever been inside Marinova's home, and the prosecutor conceded in closing argument that the People had no such evidence. The prosecutor also stated that had there been such evidence, "we would have a different case [and] would have brought different charges," presumably residential burglary of Marinova's home. Because there was no evidence linking Tessman to Marinova's home, however, the People charged Tessman with commercial burglary based upon her entry into the pawn shop with the intent to sell stolen property, and at trial the prosecutor introduced evidence and advanced argument in support of that theory. Hence, contrary to the majority's reading of the record, in deciding *that charge*, the issue the court actually focused on was whether Tessman "either knew or had reason to know" the necklace she sold at the pawn shop was stolen. And, based on Tessman's unsatisfactory explanation of how she acquired the necklace, the court actually concluded Tessman "knew the item or reasonably should have known the item was in fact stolen." The court never determined that she, in fact, stole the necklace, as the majority erroneously asserts.

5

On this record, the trial court's repeated references to what Tessman should have known about the stolen character of the necklace cannot reasonably be characterized as "nothing more than a secondary slip of the tongue."  (Maj. opn., *ante*, at p. 15.)  In my view, therefore, the majority incorrectly relies on the rule that "secondary remarks" cannot impeach a trial court's finding of guilt "where a judge's statements as a whole disclose a correct concept of the law and its application."  (*Cartier*, *supra*, 54 Cal.2d at p. 313.)  "That rule is inapplicable here, . . . for as just shown the 'judge's statements as a whole' disclose an incorrect rather than a correct concept of the relevant law, embodied not merely in 'secondary remarks' but in his basic ruling . . . ."  (*People v. Ortiz* (1964) 61 Cal.2d 249, 253; accord, *Butcher*, *supra*, 185 Cal.App.3d at p. 936.)  Furthermore, because in its basic ruling on the commercial burglary charge the trial court articulated legally correct and incorrect theories of guilt, "and because it is impossible to tell under which theory the [court] reached its [decision], the [commercial burglary] conviction is suspect and must be reversed."  (*People v. Brown* (1991) 226 Cal.App.3d 1361, 1372, citing *Green*, *supra*, 27 Cal.3d at pp. 69, 71.)  Accordingly, I dissent from the portion of the majority's opinion affirming Tessman's commercial burglary conviction.


IRION, J.


6