Filed 5/6/16  P. v. Ludtke CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>AARON ABNER LUDTKE,<br><br>        Defendant and Appellant. | A144485<br><br>(Lake County<br>Super. Ct. No. CR935815) |

Defendant Aaron Abner Ludtke was charged with and convicted of willfully failing to update his registration as a sex offender within five days of his birthday (Pen. Code, § 290.012, subd. (a); § 290.018, subd. (b)).[1]  At a bench trial, he conceded his failure to update his registration, but presented evidence intended to show his failure was not willful because he was suffering from severe mental impairment at the time he was required to update his registration.  On appeal, defendant argues there was insufficient evidence showing he willfully failed to update his registration.  We disagree and affirm the judgment.

**BACKGROUND**

In March 2002, defendant pleaded guilty in the state of Washington to one count of rape in the second degree and one count of "indecent liberties."  After his conviction,

---

[1] All further unspecified statutory references are to the Penal Code.

defendant moved to California and does not dispute he was required to register as a sex offender pursuant to California law.[2]

On June 5, 2014, the Lake County District Attorney filed an information charging defendant with a single felony count of failing to update his registration as a convicted sex offender within five days of his birthday. It was further alleged that defendant previously served a prison term after being convicted of failing to register as a sex offender in October 2012 (§ 667.5, subd. (b)).

Defendant waived his right to a jury trial and the matter proceeded to a bench trial on January 7, 2015. Defendant's counsel informed the court his client's defense would be that he "did not intentionally fail to register but has [] various neurological and psychological issues that caused him to simply forget to do so[.]"

### Prosecution's case

Ronnie Warren, a correctional officer with the Lake County Sherriff's Department, testified about providing defendant with information to update his registration as a sex offender. Warren met with defendant in June 2013 when defendant registered as a sex offender after changing his address. During that meeting, Warren gave defendant a form titled "Sex Registration / Change of Address / Annual or Other Update," that listed 10 registration requirements for sex offenders. One of the requirements stated: "I must annually update my registration information in person, within five (5) working days before or after my birthday, at the law enforcement agency having jurisdiction over my residence address . . . . Annual updates begin with my first birthday following registration or change of address." Warren asked defendant to read the requirements, and then initial each of the requirements if he understood them. Defendant read the form and put his initials next to each of the 10 requirements. Warren did not recall defendant asking any questions about the form. Warren also provided

---

[2] In explaining the basis of his crimes to the court in Washington, defendant stated that while working as a health provider, he "digitally penetrated" and "knowingly had sexual contact with a client" during a treatment session.

2

defendant with a sex registration card to carry with him, which listed when defendant's next annual registration was due.

Richard Kreutzer, a deputy sheriff in Lake County, testified that he went to defendant's residence on May 6, 2014, along with two police detectives after defendant failed to update his sex offender registration within five days of his birthday, which, as later testimony revealed, was on April 18. Kreutzer searched defendant and retrieved a metal case from defendant's pocket. Inside the case were defendant's California state ID and his sex offender registration card. Defendant was surprised that Kreutzer and the two detectives were at his residence, and told them he did not believe he had failed to register as a sex offender. Defendant did not seem confused, did not mention that he received a head injury recently or that he was taking medication, and did not appear to be under the influence of alcohol or other controlled substances.

Ken Garcia, a parole agent for the California Department of Corrections, testified about supervising defendant following a previous conviction for failure to register as a sex offender. From the time defendant was on parole beginning in May 2013, Garcia met with defendant at least two times per month, and defendant never missed a scheduled visit. Defendant once missed an in-person appointment with a clinician for the parole unit in Ukiah, but worked out a telephonic interview and was not charged with violating his parole. Defendant never told Garcia he had difficulty remembering things; he also understood the conditions of his parole and had no difficulty following the conditions, although he had once violated his parole by having a Facebook account, which was not permitted. On at least six to 10 occasions, defendant and Garcia discussed defendant's goal of furthering his education so that he could pursue a career in healthcare once he was off parole. Garcia was impressed with defendant's ability to juggle all of his obligations, such as going to school, working, and complying with his parole conditions. Garcia never had the impression that defendant had a hard time following discussions, keeping track, or staying on point with the subject of the discussion. When Garcia would ask defendant about another subject, Garcia never observed defendant drifting off into his plans for furthering his education.

Garcia remembered a discussion with defendant that he was "juggling a lot of things" and "had a lot of things on his plate," including working, travelling, and furthering his education. Garcia was "pretty impressed" at all of the things defendant was able to do. Garcia did not recall defendant ever saying he felt anxiety about failing tests relating to the reinstatement of his chiropractic license.

Garcia recounted that defendant mentioned he was once physically assaulted in San Francisco and suffered "some injury." Garcia also remembers defendant mentioning a separate incident where defendant's car collided with a deer, but defendant never mentioned he suffered a head injury or lost consciousness as a result of the collision. Defendant told Garcia that he took Ritalin, and may have mentioned that he also took anti-depressant drugs, although defendant never told Garcia he was feeling depressed. Defendant never displayed any manic behavior or rapid speech when he talked to Garcia.

Todd Dunia, a detective for the Lake County Sheriff's Department, testified that on May 5, 2014, he investigated whether defendant updated his registration within five days of his birthday, which was April 18. After accessing the Department of Justice's files and the California Sex and Arson Registry, Dunia determined that defendant did not update his registration. Dunia went to defendant's residence on May 6 to tell him he failed to update his registration. Defendant told Dunia that he thought he only had to register when he moved. Defendant did not seem confused. Rather, he seemed surprised that the officers were there.

**Defendant's case**

*Supporting letters*

Without objection, defendant introduced in evidence a set of letters from people that "attest to his character." These included letters from defendant's parents and grandfather. Two of the individuals who wrote letters were doctors and chiropractors that knew defendant in both a personal and professional capacity.

*Defendant's testimony*

Defendant testified on his own behalf. Defendant worked as a licensed chiropractor in Washington state but lost his license following his convictions in 2001.

4

Defendant had been trying to regain his chiropractic license and was taking review classes.

Defendant was involved in a car accident with a deer in December 2013 that caused him to briefly lose consciousness.[3] Defendant said the accident caused him some difficulty in thinking, although he also said that before the accident, he failed two tests and did very poorly on an oral test, apparently having to do with regaining his chiropractic license. Defendant went to see a chiropractor 10 days after the car accident. The chiropractor recommended that defendant see a neurologist, but defendant never followed through on the recommendation.

Defendant reported that he sustained a head injury in late 2012 after being assaulted in San Francisco. Prior to the injury, defendant was taking Adderall and Xanex to treat Attention Deficit Disorder and anxiety. After the injury, defendant began taking Neurontin for pain and depression. He experienced various side effects from taking these drugs, including poor memory. Defendant also began experiencing neuropathy, which he described as a tingling of the arms and legs. This caused his depression and pain to worsen.

Defendant said he suffered another head injury in April 2014. Defendant reported that he was trying to load some wood on the side of a steep hill and slipped, causing him to hit the back of his head. This was the same area of his head that was injured in 2012. Defendant was seen by a doctor after sustaining the injury. The injury put defendant in a "tailspin"; his depression was getting worse, and he was also having issues with his car, which was overheating and caused defendant to worry about whether he would be able to drive to his classes. Defendant was also assisting his elderly roommate set up a website for the roommate's tool business during this time.

---

[3] On direct examination, defendant testified the accident occurred in December 2014; on cross-examination, he said it was in December 2013. We will assume defendant intended to say the accident occurred in December 2013, which was before the birthday registration deadline in April 2014. Defendant was trying to show that head injuries contributed to his failure to register in April 2014, and any injury sustained in December 2014 would have been irrelevant for that purpose.

5

After discussing his history of head injuries, defendant was asked why he did not register within five days of his birthday. Defendant responded, "You know, I always thought that you have to reregister when you move. And you—you know, I had side effects from that medication, actually some short-term memory loss. And I was disoriented and stressed out." He also said he was not aware that he had to update his registration as a sex offender within five days of his April 18th birthday.

On cross-examination, defendant acknowledged that Warren, the Lake County correctional officer, gave him a copy of the requirements for registering as a sex offender. Defendant said he read every requirement that he initialed, including the birthday registration requirement, but he did not recall "reading all the details." Defendant also acknowledged he carried a sex offender registration card with him, which informed him of the requirement to update his registration on his birthday, April 18.

*Defendant's expert witness*

Dr. John Podboy, a clinical and forensic psychologist retained by defendant, testified that he examined defendant on November 13, 2014. Dr. Podboy administered a number of psychological tests to defendant, and defendant performed poorly on them. According to Dr. Podboy, defendant's "comprehension was very impaired. And his functioning was so poor that it was then and is now very difficult for me to understand how he went through high school and an accelerated community college program and then went on to get his doctorate in chiropractics. I don't know how to account for that." Dr. Podboy's testing also showed that defendant would have difficulty adhering to moderately complex instructions. One of the tests Dr. Podboy administered was the booklet category test, which assesses memory and the ability to correct mistakes. Dr. Podboy stated defendant "made error after error. And when we finished, he had so many errors, it was very embarrassing for him I think." It was Dr. Podboy's opinion that defendant's performance on the booklet test was consistent with someone who had experienced brain damage, and that the multiple head injuries described by defendant could be a causative factor. Dr. Podboy added that he "didn't see any indication whatsoever of [defendant] engaging in feigning or anything of the sort."

6

Dr. Podboy also testified about defendant's demeanor during his examination. Defendant was a "very anxious individual. . . . [¶] And then he would go on about things that were kind of farfetched actually," like opening a chiropractic practice overseas and explaining how he used to see 40 to 80 patients a day. Dr. Podboy was aware that defendant was taking Neurontin to control his anxiety, and stated that the drug can cause both confusion and impaired memory. Dr. Podboy also reviewed the results of an electroencephalogram (EEG) performed on defendant. The results of the EEG, which measures electro brain activity, were consistent with Dr. Podboy's findings.

On cross-examination, Dr. Podboy said defendant was anxious when the two of them met, possibly because defendant was incarcerated. Dr. Podboy also said that defendant's difficulty staying on task during their meeting could be due to the fact that defendant was not taking medicine to control his Attention Deficit Disorder while incarcerated.

The prosecutor asked Dr. Podboy about his conclusion that defendant was not malingering during their meeting. Dr. Podboy acknowledged that defendant was "potentially" in a particular position where he would benefit from presenting himself as less intellectually capable than he actually is. Dr. Podboy's conclusion that defendant was not malingering was not based on any test, but only based on Dr. Podboy's clinical observation. The "booklet category" test had no scale or any sort of mechanism to detect malingering.

The prosecutor cross-examined Dr. Podboy about defendant's December 2013 car accident with the deer. According to Dr. Podboy, an accident like the one reported by defendant that is significant enough to cause a substantial loss of consciousness would "undoubtedly" result in bruising, which would be evident 10 days after the accident. Dr. Podboy acknowledged, however, that he read a report prepared by the chiropractor that defendant saw 10 days after the accident, and the report stated that there was no evidence of masses, bruises, or abnormalities.

Dr. Podboy said he would expect defendant to have difficulties complying with the conditions of his parole, including making scheduled appointments with a parole

agent, which was not the case. The prosecutor asked Dr. Podboy to explain whether defendant's accomplishments in life were inconsistent with how he performed on the psychological tests. The following line of questioning ensued:

"Q. I think you also indicated that to you there was an inconsistency in the accomplishments that [defendant] had achieved in his life and the functioning that he demonstrated by his performance on the tests?

"A. A marked inconsistency, yes.

"Q. All right. And did you form an opinion as to how that would be the case?

"A. I believe, according to what [defendant] has told me, I've discovered that he has had repeated insults to his central nervous system from all sorts of different traumas, whether or not this incidence [sic] with the deer is credible or not. But given his pathological results with the objective finding that I mentioned earlier, it would appear that over the years he's got these accumulative traumas that have caused him to become impaired. And again, frankly, I don't know how he ever was able to function as a chiropractor.

"Q. All right. Is . . . the level of dysfunction that you're thinking of here, . . . is that something that would be evident to people who were familiar with [defendant] over an extended period of time?

"A. I would think so, yes.

"Q. All right. And so you're relying on—and I don't want to be rude about this. But you're relying on the accuracy of the things that [defendant] told you to come to that conclusion?

"A. To a considerable extent, yes.

"Q. All right. Is it possible—let me say that hypothetically. [¶] Let us say that [defendant] is not being accurate about the things that he told you. Is it possible that [defendant] is malingering?

"A. It's possible . . . . [¶] . . .

8

"Q. So it's possible that the explanation for the—the inconsistency in his achievements and his performance on the tests that you gave him is that he wants to do poorly, because he thinks it would benefit him in a forensic sense?

"A. It's possible, I suppose."

After the parties examined Dr. Podboy, the court asked Dr. Podboy to compare how defendant's trial testimony compared to how defendant had presented himself when Dr. Podboy examined him less than two months earlier:

"THE COURT: Doctor, did you hear [defendant's] testimony today?

"THE WITNESS: Yes, I did.

"THE COURT: Did you find it to be responsive?

"THE WITNESS: To some extent. He actually did better on his own in court than he did in my office.

"THE COURT: Could you . . . be more descriptive in terms of how much more coherent he was here than then?

"THE WITNESS: Well, he was able to recognize his signature, recognize the obligations of the 290 registrant. And he didn't stumble around as he did in my office, because he had me kind of confused actually, and I had to ask him a number of times to explain to me what exactly has happened. [¶] . . . [¶] . . .

"THE COURT: Did you hear his testimony with regard to his previous registration as a sex offender?

"THE WITNESS: Yes, Your Honor.

"THE COURT: And that his understanding was that he was supposed to do so upon any change of address?

"THE WITNESS: Yes, I hea[r]d that.

"THE COURT: And that he in fact did so?

"THE WITNESS: Yes, I heard that, Your Honor. [¶] . . . [¶] . . .

"THE COURT: Is that testimony inconsistent with your opinions with respect to his ability to perform those kinds of activities?

9

"THE WITNESS:  Well, no.  It was an improvement today in comparison to what we discussed in early November of last year.  And perhaps it's due to the medication.  I'm not certain, but he was more focused, especially during cross-examination.

"THE COURT:  Are you saying, then, that his condition worsened between the time of his registration and your examination?

"THE WITNESS:  Apparently.

"THE COURT:  And are you saying that his condition has improved today based upon what it was at the time of the examination?

"THE WITNESS:  Yes, sir."

***Trial court finding of guilt***

Following the close of evidence, both parties made closing arguments.  The prosecutor focused on Dr. Podboy's testimony, arguing that his test results "are absolutely inconsistent with what [defendant] has accomplished in his life.  He said . . . that he was surprised [defendant] was even able to graduate from high school.  He suggested that [defendant] was going to need a guardian ad litem if he was released from custody, so severe is his intellectual defect.  [¶] Well, that's just absolutely, frankly, ludicrous.  [Defendant] testified [he] accomplished a lot of things in his life.  He may or may not have thrown all those things away by subsequent bad choices that he's made, but there's absolutely no doubt that he has the capacity to fulfill his obligations under Penal Code section 290."  The prosecutor also discussed the letters of support defendant submitted to the trial court, stating "there's nothing in any of these letters" showing defendant was disorganized or had memory trouble.

Defendant's attorney contended that "[i]t just doesn't make any sense that [defendant] would knowingly evade" the birthday registration requirement.  "What makes more sense," defendant's attorney argued, "is that he simply forgot, because he's an idiot, he spaced out, he's got a brain injury, or he just forgot for whatever reason."  Defendant's attorney conceded "it's a little startling that he had [the registration card] in his pocket," but argued it showed that defendant's failure to register was "more of an innocent circumstance . . . .  [W]ould a person who was trying to evade registration do so

10

in such a glaring and blatant manner?  I don't think so.  I think what it is is that he simply got confused."

After taking a recess to review the exhibits, the trial court found defendant guilty beyond a reasonable doubt of failing to register as a sex offender.  The court remarked that "[g]iven the fact that the prior registration violation, given the fact of his initialing the form, given the fact that he carries with him a registration card, it's not only implausible that he did not know of the registration requirement, but there's little else if anything that the state of California or the state of Washington can do to advise him of that requirement."  The court concluded there was "evidence beyond a reasonable doubt" that defendant was "provided knowledge of his registration requirement."

The court spent considerable time discussing Dr. Podboy's testimony, stating that it "could not possibly be accurate, at least at the time of [defendant's] registration requirement."  The court was skeptical of Dr. Podboy's opinion because Dr. Podboy acknowledged that defendant's condition "worsened drastically at the time of the interview [in November 2014] and obviously has improved greatly since[.]"  The court continued, "I'm just very, very confused by that opinion, that testimony. . . .  I'm not a psychologist, but I just don't get that opinion, because it's contrary to all the other evidence, including the defendant's own testimony."  The court also could not reconcile Dr. Podboy's testimony with the letters of support defendant had offered into evidence, noting that the letters never attributed defendant's failure to register with brain damage or severe mental impairment.  The court stated it did not believe Dr. Podboy's assessment of defendant because "nobody shares those opinions," which were "totally inconsistent with everything else that I know of."

The court concluded, "So I find that there's evidence beyond a reasonable doubt that there was knowledge of the requirement and that there was a violation . . . .  He failed to act as he was required to do so.  And that's a violation.  So I find him guilty of the crime charged."  Defendant was sentenced to four years in prison.

This timely appeal followed.

**DISCUSSION**

Defendant contends his conviction must be overturned because there was insufficient evidence to show that his failure to renew his registration was willful. We disagree.

"[W]here a jury has been waived, before the judgment may be set aside on appeal, it must clearly appear that upon no hypothesis is there sufficient evidence to support the conclusion reached by the trial court." (*People v. Hills* (1947) 30 Cal.2d 694, 701.) In assessing the sufficiency of the evidence, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the [trial court's ruling]—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).)

A registered sex offender must, within five working days of the offender's birthday, update his or her registration. (§ 290.012, subd. (a).) A registrant's willful failure to update his or her registration is a felony. (§ 290.018, subd. (b). The willfulness element of the statute requires "actual knowledge" of the duty to register, and the trier of fact "may infer knowledge from notice, but notice alone does not necessarily satisfy the willfulness requirement." (*People v. Garcia* (2001) 25 Cal.4th 744, 752.)

In *People v. Barker* (2004) 34 Cal.4th 345 (*Barker*), our Supreme Court held that the willfulness element may not be negated by evidence a defendant "*just forgot*" to

12

register, although the court left open the question of "whether forgetfulness resulting from, for example, an *acute psychological condition*, or a *chronic deficit of memory or intelligence* might negate the willfulness required for a section 290 violation." (*Id.* at p. 358.) One year after *Barker*, the high court elucidated the willfulness requirement in *People v. Sorden* (2005) 36 Cal.4th 65, 68 (*Sorden*), holding that "the willfulness element of the offense may be negated by evidence that an involuntary condition—physical or mental, temporary or permanent—deprived a defendant of actual knowledge of his or her duty to register." (*Id.* at p. 69.) The Court, however, placed limits on the types of conditions that can negate actual knowledge, stating that "[o]nly the most disabling of conditions" would qualify to negate the actual knowledge requirement, and giving as examples "severe Alzheimer's disease" or "general amnesia induced by severe trauma." (*Id.* at p. 69.) "It is simply not enough for a defendant to assert a selective impairment that conveniently affects his memory as to registering, but otherwise leaves him largely functional." (*Id.* at p. 72.)

Viewed in a light most favorable to the judgment, the evidence showed defendant had actual knowledge of the requirement to update his registration within five days of his birthday. It was undisputed that defendant was provided with clear notice of the requirement in June 2013—approximately 10 months before his birthday—when he met with Warren, the Lake County correctional officer, who gave defendant a form stating he was required to update his registration within five days of his birthday. Defendant read and initialed the requirements on the form. Defendant was also given a registration card listing the birthday registration requirement, and was actually carrying this card in May 2014 when he was arrested for failing to register. There was also substantial evidence that defendant had the ability to remember to update his registration within five days of his birthday. Garcia, defendant's parole agent, testified defendant never missed a scheduled visit with him during the time he supervised defendant from May 2013 until April 2014. Nor did Garcia ever notice anything suggesting defendant had a poor memory. To the contrary, Garcia was impressed with defendant's ability to "juggle"

13

several obligations at once, including attending classes for his chiropractic relicensing, working, and complying with his parole conditions.

Defendant claims the evidence "overwhelmingly" supported his position that near the time of his birthday, he did not have the "cognitive capacity" to execute the registration requirements. Defendant points to Dr. Podboy's opinion that defendant was mentally impaired, possibly from receiving multiple injuries to his head—an opinion that was supported by an EEG, as well as by defendant's own testimony that he suffered short-term memory loss and sustained head injuries. The trial court considered this evidence and apparently rejected it. Except for defendant's presentation on November 13, 2014, when he was examined, Dr. Podboy's conclusions were contradicted by other evidence, including the letters of support submitted by defendant, which never attributed defendant's failure to register with brain damage or severe mental impairment. Dr. Podboy's opinion was also contradicted by the way defendant appeared to his parole officer while he was under the parole officer's supervision, and even the way defendant presented at trial, which was greatly different from Dr. Podboy's three-hour examination less than two months earlier. It was within the trial court's province to reject Dr. Podboy's opinion. (See *Zamudio, supra*, 43 Cal.4th at p. 357 [trial court determines credibility of a witness and the truth or falsity of the facts].)

Defendant argues there was insufficient evidence to show he had actual knowledge of the birthday registration requirement because the prosecution did not adduce any evidence specific to the day of his birthday, April 18, 2014. This argument is without merit. The prosecution produced evidence showing defendant knew of the registration requirement beginning in May 2013, and also knew of it in May 2014 when he was found with the registration card in his pocket. It was reasonable for the court to infer that because defendant had knowledge of the requirement both before and after his birthday, he also had such knowledge at the time of his birthday. (*Zamudio, supra*, 43 Cal.4th at p. 357 [reviewing court " 'must accept logical inferences' " that trier of fact " 'might have drawn from the circumstantial evidence' "].)

14

Last, defendant asserts the trial court's discussion of its decision "appear[s] to suggest a misunderstanding of the applicable law" because the court stated that forgetting to register is not a defense to failing to register. In a criminal bench trial, the trial court is not required to provide a statement of decision. (*People v. Grana* (1934) 1 Cal.2d 565, 571.) As a leading treatise states, "Where a *jury's* guilty verdict may rest on a legally correct theory or a legally incorrect theory, the conviction must be reversed, unless the reviewing court can determine from the record that the conviction necessarily rested on the legally correct theory. However, this rule has no application to the review of a verdict returned by a trial court sitting without a jury. Thus, a trial judge's remarks in a bench trial cannot be used to show that the judge misapplied the law or erred in his or her reasoning, subject to the exception that these remarks may be considered when they *unambiguously* disclose that the judge applied an erroneous interpretation of the law. (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302)." (6 Witkin & Epstein, Cal. Criminal Law (2015 supp.) Criminal Appeal, §165, p. 30.)

Contrary to defendant's argument, the trial court's comments are fully consistent with the Supreme Court's explanation of the willfulness requirement in *Barker* and *Sorden.* In *Barker*, the court held that the willfulness element may not be negated by evidence a defendant "*just forgot*" to register. (*Barker, supra*, 34 Cal.4th at p. 358.) And in *Sorden*, the court held that "[o]nly the most disabling of conditions" can negate the actual knowledge requirement. (*Sorden, supra*, 36 Cal.4th at p. 69.) Consistent with the law, the trial court permitted defendant to introduce evidence of his psychological state, but then did not find convincing the evidence that was intended to show defendant suffered from a disabling condition. On this record, the judge's remarks do not unambiguously disclose that the judge applied an erroneous interpretation of the law. (*People v. Tessman, supra*, 223 Cal.App.4th at p. 1302.)

## DISPOSITION

The judgment is affirmed.

15

_____
Miller, J.

We concur:


_____
Richman, Acting P.J.


_____
Stewart, J.