Filed 12/30/20  P. v. Clapps CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EUGENE LAMONT CLAPPS,<br><br>    Defendant and Appellant. | D076657<br><br><br><br>(Super. Ct. No. SCD280779) |


APPEAL from a judgment of the Superior Court of San Diego County, Peter L. Gallagher, Judge.  Reversed in part and remanded.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Eugene Lamont Clapps appeals from a judgment entered after a bench trial on the criminal charges brought against him.  The trial court found Clapps guilty of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and assault with a deadly weapon. (§ 245, subd. (a)(1).)  The trial court sentenced Clapps to a 13-year prison term.

Clapps contends that the attempted murder conviction should be reversed because the trial court's comments reveal that it based its decision on an incorrect understanding of the applicable legal standards as to both heat of passion and imperfect self-defense, either of which could reduce attempted murder to attempted voluntary manslaughter.  In addition, Clapps contends that the trial court should have found that he acted in imperfect self-defense in light of other comments it made when delivering its decision.

We conclude that reversal of the attempted murder conviction is required because the trial court applied an erroneous legal standard when determining whether Clapps acted in the heat of passion for the purpose of reducing attempted murder to attempted voluntary manslaughter.

I.

FACTUAL AND PROCEDURAL BACKGROUND

Clapps and Jeremy J.,[2] who knew each other because they lived in the same foster home during their youth, encountered each other on the street one day.  When Jeremy asked Clapps if he knew where to buy some marijuana, Clapps said he knew where to go, and that Jeremy should give

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]    We refer to the victim by his first name to preserve his privacy, and we intended no disrespect by doing so.

him $20.00.  Jeremy waited for Clapps to come back with the marijuana, but Clapps did not return.[3]

Within the next few days, Jeremy and Clapps again saw each other on the street, and Jeremy asked about his marijuana.  According to Clapps, Jeremy seemed aggressive during their interaction.  Clapps told Jeremy he would rectify the situation by rolling a blunt for Jeremy and smoking it with him in Jeremy's apartment.[4]  Jeremy and Clapps were in Jeremy's apartment for about 35 minutes, during which time Clapps rolled a blunt and the men shared a smoke.  According to Clapps, while in the apartment, Jeremy seemed like he still had some animosity from what happened with the failed marijuana transaction.  According to Jeremy, he was bothered by Clapps's behavior in the apartment because Clapps was shouting down to people on the street, telling them to come up to the apartment.

At some point, Jeremy told Clapps that he wanted Clapps to leave,[5] but Clapps refused to do so.  A physical altercation ensued, which ended with Clapps pulling out a knife and stabbing Jeremy in the chest six times.  One of the stabs was deep enough to enter Jeremy's chest cavity and lacerate a lung.

---

[3]     The evidence was in conflict as to why Clapps did not return with Jeremy's marijuana.  Clapps testified that he did not return because the quality of the marijuana he purchased with Jeremy's money was too poor to take it to Jeremy.  Jeremy testified that Clapps later claimed he didn't return with the marijuana because he got arrested.

[4]     A blunt is "a marijuana cigarette . . . made by putting marijuana into the wrapper of a hollowed-out cigar."  (Collins English Dict. (online ed. 2020) <https://www.collinsdictionary.com/us/dictionary/english/blunt> [as of Dec. 30, 2020]).

[5]     Jeremy testified he told Clapps to leave because Clapps couldn't stay in the apartment by himself after Jeremy left to do laundry.

Jeremy was hospitalized for several weeks.

Clapps was charged with attempted murder (§§ 664, 187, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(1)), with additional allegations for both counts that Clapps inflicted great bodily injury on the victim (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a)), and used a knife in the commission of the offense (§ 12022, subd. (b)(1)). It was also alleged that Clapps served three prior prison terms. (§§ 667.5, subd. (b), 668.) Clapps waived his right to a trial by jury.

Both Clapps and Jeremy testified at the bench trial. The two men gave differing accounts of the physical altercation that led to the stabbing.

According to Jeremy, when he asked Clapps to leave the apartment Clapps complied without argument but then returned a minute later. After Clapps returned, Jeremy told Clapps more than once that he had to leave, but Clapps said "Hell nah, I'm not leaving." Jeremy pushed Clapps and the two men ended up struggling, which Jeremy described as a "push and pull." Jeremy did not have any weapons and did not punch or kick Clapps. After Jeremy pushed Clapps multiple times, Clapps pulled a knife and stabbed Jeremy in the chest. Jeremy blacked out for a short time after being stabbed. When he regained consciousness, Clapps was gone. Jeremy went downstairs and asked the security guard to call 911.[6]

---

[6] At trial, defense counsel attacked Jeremy's credibility with evidence that Jeremy gave the police several differing accounts of how he came to be stabbed. Significantly, the first time Jeremy spoke with police, Jeremy claimed he was stabbed at a location around the corner from his apartment building by a green-eyed Hispanic man. Weeks later, after a detective reviewed security camera videos from the apartment building and blood was found in Jeremy's apartment, Jeremy admitted that he was stabbed in the apartment, but didn't say who stabbed him. Finally, another month later, Jeremy told the detective that Clapps stabbed him.

Clapps testified that he was in Jeremy's apartment, when Jeremy unexpectedly told him to leave.  According to Clapps, Jeremy said, "My blunt is rolled.  We smoked a little bit, now nigga get the fuck out my house."  While saying this, Jeremy was walking toward Clapps in an aggressive manner.  Clapps was "stunned, shocked and surprised."  Clapps believed that he was "going out of [his] way to be a good man and a righteous man" by making up for his failure to deliver marijuana to Jeremy.  Because he was shocked, Clapps did not register what Jeremy was saying and did not leave.  Jeremy then pushed Clapps and said, "Nigga, you hear me.  Get the fuck out of my house."  When asked whether he was angry with Jeremy, Clapps testified, "What really made me angry was when he was walking up on me telling me 'get the fuck up out of my house.'  And walking up on me. . . .  Then he pushes me— . . . but I'm keeping my composure.  I'm not fighting back."

According to Clapps, after Jeremy pushed him several times, Jeremy "put his head down and started swinging, but he wasn't landing no blows, and we broke off into a tussle—like a wrestle."  While they were wrestling, Jeremy said, "Nigga, this is my house.  I pay rent here.  Get the fuck up out of my house, little nigga, before I kill you."  In the course of wrestling with Jeremy, Clapps ended up on top of Jeremy.  He straddled Jeremy, pinning Jeremy down "flat on his back."[7]  While straddling Jeremy, Clapps pulled out a pocket knife and stabbed Jeremy in the chest using an overhand motion

---

[7]     Clapps testified that while pinned on the ground, Jeremy was "laying flat on his back with his arms side by side."  For clarification, counsel asked Clapps, "when you say 'side by side,' you mean hands at the waist or are they up?"  Clapps responded by demonstrating in a manner not reflected in the reporter's transcript.  The trial court stated during its findings that Jeremy was "laying on the floor with his hands at his side."

"like Chucky."[8]  As Clapps explained, "[I] just hit him a few times to let him know what's happening and got the fuck out of there . . .  The motherfucker put his hands on me and threatened my life."  Clapps testified that he stabbed Jeremy because "I was just trying to, one, get him off of me.  And two, . . .  let him know real quick, . . . and get up out that house."

Prior to closing arguments, counsel identified for the trial court the jury instructions that it wanted the court to consider in deciding the case.  As relevant here, defense counsel identified CALCRIM No. 603, which sets forth the requirements for finding attempted voluntary manslaughter based on heat of passion, and CALCRIM No. 604, which sets forth the requirements for finding attempted voluntary manslaughter based on imperfect self-defense.

The trial court issued an oral decision.  It found Clapps guilty of attempted murder and assault with a deadly weapon and made true findings on the deadly weapon and great bodily injury allegations.  The trial court explained its findings, including comments on why it concluded that Clapps did not commit attempted voluntary manslaughter based on either a heat of passion or imperfect self-defense theory.

> "As to heat of passion, as defined in CALCRIM 603, there was insufficient provocation to justify Mr. Clapps' response with the knife.  Yes, there was a push.  Yes, there was a tussle, but none of these actions were sufficient provocation to cause a person of average disposition to act in a manner of producing a knife while the person was prone, and then stab them six times. [¶]  The push and pull or tussle was not an act to cause intense emotions justifying someone to act in this matter.  Per the instruction, slight provocation is insufficient.

---

[8]     We understand Clapps to have been referring to the well-known "Chucky" character in a series of horror films.

"As to the imperfect self-defense, Mr. Clapps did not establish that he was in imminent danger of being killed or suffering great bodily harm. When he produced a knife, [Jeremy] was in a prone position with his hands at his side while the defendant straddled atop him. [¶] No facts have been set forth to show Mr. Clapps believed that the immediate use of deadly force was necessary to defend against any imminent danger of being killed or suffering GBI—great bodily injury."

The trial court made true findings regarding Clapps's prior convictions, and it sentenced Clapps to prison for a term of 13 years.[9]

## II.

## DISCUSSION

A.   *Legal Principles Applicable to Reviewing a Trial Court's Decision in a Criminal Bench Trial*

Clapps's appeal focuses on the attempted murder conviction. According to Clapps, when delivering its ruling, the trial court made comments that revealed it applied an incorrect understanding of the legal standards governing both heat of passion and imperfect self-defense, either of which could reduce attempted murder to attempted voluntary manslaughter.

As a first step in evaluating Clapps's argument, we examine the case law explaining the significance we may accord to the statements made by a trial court when delivering its decision in a bench trial in a criminal prosecution.

"As a broad general proposition, cases have stated that a trial court's remarks in a bench trial cannot be used to show that the trial court misapplied the law or erred in its reasoning. [Citations.] These statements are founded on the principle that, in a criminal bench trial, the trial court is not required to provide a statement of decision and that any explanation of

---

[9]    On the assault with a deadly weapon count, the trial court imposed a seven-year prison term and stayed the sentence pursuant to section 654.

7

his or her decision a trial judge provides is not part of the record on appeal." (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302 (*Tessman*).)

However, "[t]his broad proposition has been subjected to an important limitation. . . . [W]e may nonetheless consider a judge's statement when, *taken as a whole,* the judge's statement discloses an incorrect rather than a correct concept of the relevant law, 'embodied not merely in "secondary remarks" but in [the judge's] basic ruling.' " (*Tessman, supra*, 223 Cal.App.4th at p. 1302.) Under this approach, "[t]he oral opinion of the trial court may be used in interpreting the court's action in its decision of the case if it unambiguously discloses the mental processes of the trial judge in reaching his conclusion." (*People v. Butcher* (1986) 185 Cal.App.3d 929, 936 (*Butcher*).) Accordingly, a criminal defendant, may seek reversal on appeal if the trial court's statements in delivering its ruling, "*unambiguously* disclose that, in his or her ruling, the trial judge applied an erroneous interpretation of the law." (*Tessman,* at p. 1303; see also *In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1440 (*Jerry R.*) ["An exception to this general rule exists when the court's comments unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law"].)

Applying this principle, trial court rulings in bench trials are reversed when the trial court's comments reveal it applied an erroneous legal standard in reaching a decision. (*Butcher, supra,* 185 Cal.App.3d at pp. 936-938 [reversing judgment based on trial court's comments showing that it applied the wrong legal standard regarding the crime of diverting construction funds]; *Jerry R., supra,* 29 Cal.App.4th at pp. 1440-1441 [reversing the court's finding that the juvenile committed willful discharge of a firearm because the finding was based on an incorrect legal standard for that crime].)

8

B.  *The Trial Court Unambiguously Applied an Incorrect Understanding of the Law on Heat of Passion for the Purpose of Reducing Attempted Murder to Attempted Voluntary Manslaughter*

We next turn to Clapps's contention that the trial court applied an incorrect legal standard in deciding whether Clapps should be found guilty of attempted voluntary manslaughter rather than attempted murder on the ground that he acted in the heat of passion. Specifically, our inquiry is whether the trial court's comments unambiguously show that it applied an incorrect legal standard in arriving at its decision with respect to heat of passion.

We begin with an overview of the concept of heat of passion in the context of a prosecution for murder (or, in this case, attempted murder). "The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)[10]

_____

[10]  These principles, applied to an attempted killing, are set forth in CALCRIM No. 603, under which a finder of fact may find that the defendant acted in the heat of passion if "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment" and "[t]he attempted killing was a

9

In *Beltran*, our Supreme Court clarified that in assessing the adequacy of provocation for determining whether the defendant acted in the heat of passion, the proper inquiry is not "whether an ordinary person of average disposition *would be moved to kill*" under the circumstances at issue in the particular case. (*Beltran, supra*, 56 Cal.4th at p. 946, italics added.) As *Beltran* explained, "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, *not on his particular act*. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection. To satisfy [the applicable standard], the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Id.* at p. 949, first italics added.) "Provocation is adequate only when it would render an ordinary person of average

rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment." (CALCRIM No. 603.) The instruction also states, "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] . . . While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] . . . You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment." (CALCRIM No. 603.)

disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Id*. at p. 957.)

As Clapps points out, the trial court applied exactly the type of inquiry that *Beltran* disapproved by focusing on Clapps's *act* of stabbing Jeremy. Specifically, the trial court stated, "As to heat of passion, as defined in CALCRIM 603, there was insufficient provocation *to justify Mr. Clapps' response with the knife*. Yes, there was a push. Yes, there was a tussle, but none of these actions were sufficient provocation to cause a person of average disposition *to act in a manner of producing a knife while the person was prone, and then stab them six times*. [¶] The push and pull or tussle was not an act to cause intense emotions justifying someone *to act in this matter*. Per the instruction, slight provocation is insufficient." (Italics added.) The trial court's comments show that it improperly inquired "whether the average person would *act* in a certain way," rather than whether an average person would "react*,* without reflection" with "his reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949, italics omitted.)

The People acknowledge that the trial court's comments set forth an incorrect understanding of the applicable legal standard. Specifically, the People state that "it is true the trial court here mistakenly commented that the actions of Jeremy were not sufficient provocation to cause a person of average disposition 'to act in a manner of producing a knife while the person was prone, and then stab them six times.' " Nevertheless, the People argue that "the court's statements taken 'as a whole,' . . . did not disclose an incorrect concept of the relevant law." According to the People, two aspects of the trial court's comments show that, taken as a whole, it understood and applied the proper legal standard.

11

First, the People point out that the trial court referred to CALCRIM No. 603 during its comments. The People contend that because CALCRIM No. 603 "set[s] forth the proper application of provocation," the trial court must have understood and relied upon the correct legal standard in making its ruling. We disagree. Although the trial court's comments show that it recognized CALCRIM No. 603 to be the applicable jury instruction, the trial court's discussion, taken as a whole, demonstrates it interpreted CALCRIM No. 603 in an improper manner.

Next, the People focus on the last sentence of the trial court's relevant comments, in which the court observed that "[p]er the instruction, slight provocation is insufficient." As this simple statement unquestionably reflects a proper statement of the law,[11] the People contend that the trial court rested its ruling on this accurate legal principle. The argument is not persuasive. Placed in the context of the trial court's entire comments, the court's statement about slight provocation is tainted by the court's fundamental error of focusing on whether provocation was sufficient to cause an average person to commit the type of stabbing at issue here. The trial court made the comment about slight provocation in the following context: "The push and pull or tussle was not an act to cause intense emotions justifying someone *to act in this matter*. Per the instruction, slight provocation is insufficient." (Italics added.) When viewed in this light, it is apparent that the trial court determined the provocation was too "slight" to cause an average person to "act in this manner," namely stabbing Jeremy six times while he was pinned on the ground.

---

11    CALCRIM No. 603 states, "While no specific type of provocation is required, slight or remote provocation is not sufficient." (CALCRIM No. 603.)

In sum, we conclude that the trial court's comments on the issue of heat of passion, when taken as a whole, "unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law." (*Jerry R.*, *supra*, 29 Cal.App.4th at p. 1440.)[12]

C.    *The Trial Court's Error Requires Reversal of the Judgment on the Attempted Murder Count*

Having concluded that the trial court applied an incorrect legal standard in determining whether Clapps acted in the heat of passion to reduce attempted murder to attempted voluntary manslaughter, we next consider whether that error requires that we reverse the attempted murder conviction.

The parties disagree on whether we should conduct a harmless error analysis.  Relying on a comment in *Butcher, supra,* 185 Cal.App.3d at page 937, Clapps argues that it is inappropriate for us to attempt to assess prejudice after having determined that the trial court's comments unambiguously establish that its decision was based on an incorrect legal standard.  Specifically, in *Butcher* the People suggested that the court conduct a harmless error analysis, in which it would review the evidence in the record to determine whether the evidence *would have* supported a finding of guilt *if* the trial court had applied the correct legal standard.  (*Id.* at p. 936 ["The People argue that we should indulge every favorable assumption in

_____

[12]    This is not a case, as in *Tessman*, where the trial court's comments could be viewed as *ambiguous* on whether it relied on an incorrect statement of law in reaching its ruling, or whether the reference to an incorrect legal standard "was nothing more than a secondary slip of the tongue that did not reflect its actual conclusions or reasoning." (*Tessman*, *supra*, 223 Cal.App.4th at p. 1304.)  The trial court in this case unambiguously applied an incorrect understanding of the law in analyzing whether Clapps should be convicted of the lesser included offense of attempted voluntary manslaughter based on heat of passion.

support of the judgment and uphold it on the theory that the trial court *could have found* that defendant 'diverted' more than the amount of the recoupment, if any, to which he was entitled.  If the trial court did so conclude, any error of law concerning the effect of a right to recoupment would not be prejudicial," italics added].)  *Butcher* rejected the People's argument, explaining that "it cannot be the law that a defendant may be convicted in circumstances where the conviction appears to be based upon a legally invalid theory of the law notwithstanding the presence of an alternative valid theory." (*Id.* at p. 937.)  Therefore, without conducting a harmless error analysis, *Butcher* reversed the judgment, concluding that "[s]ince the trial court held an erroneous view of the meaning of [the applicable statute] defendant's conviction is infirm." (*Id.* at p. 938.)  Similarly, in *Jerry R.*, *supra*, 29 Cal.App.4th at pages 1440-1441, the appellate court did not attempt to undertake any harmless error analysis after it determined that the court's finding that the juvenile violated a criminal statute was based on an incorrect understanding of the applicable law.

The People, in contrast, argue that a harmless error analysis is required when the trial court's comments show that a finding of guilt in a bench trial was based on an incorrect legal standard.  In support of their position, the People analogize to case law establishing that a harmless error analysis is appropriate when a *jury* is misinstructed on the applicable legal standards.  Further, the People argue that because the incorrect legal standard that the trial court relied upon in this case concerned the lesser included offense of voluntary manslaughter, the *Watson* standard for assessing the prejudicial nature of state-law errors should apply.  (See *Beltran*, *supra*, 56 Cal.4th at p. 955 [applying state-law harmless error

14

analysis in analyzing prejudice from instruction on heat of passion that the jury may have misunderstood based on comments from counsel, applying the rule that " 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]' " [(*Watson*)]].)[13] " '[U]nder *Watson,* a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Beltran*, at p. 955.)

The People have not attempted to grapple with why, despite *Butcher* and *Jeremy R.*, the harmless error analysis applied in a jury trial should apply here. However, we need not, and do not, resolve the issue of whether a harmless error analysis is appropriate when a trial court's comments unambiguously show that its findings in a bench trial were based on an incorrect legal standard. As we will explain, even assuming for the sake of our analysis that a harmless error analysis is appropriate, we conclude that the trial court's error was prejudicial under any standard for assessing prejudice, including the *Watson* standard, under which we may find prejudice

---

[13]    We are mindful that certain case law declines to interpret *Beltran* as establishing that the *Watson* standard applies, rather than the standard for federal constitutional error, whenever the jury is given an incorrect statement of law in an instruction on heat of passion. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643-644; cf. *People v. Franklin* (2018) 21 Cal.App.5th 881, 890 [in a case where the jury was misinstructed on the law regarding heat of passion, the court declined to determine whether the federal or state-law standard for assessing prejudice applied, describing the "unsettled" law on the issue of whether the absence of instruction on heat of passion amounts to federal constitutional error, and citing *Thomas*, among other cases].) We need not resolve which harmless error standard applies when the jury is misinstructed on heat of passion, as we find the error to be prejudicial even if the *Watson* standard applies.

only if a more favorable outcome is reasonably probable without the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

We thus proceed to conduct the type of harmless error analysis that would be appropriate in a jury trial. In the context of an error in instructing the jury with an improper legal standard, the court may focus its harmless error analysis on whether the evidence presented at trial would have strongly supported a finding under the correct legal standard, had it been communicated to the jury. (*Beltran, supra,* 56 Cal.4th at p. 956 [" 'an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result' "].) The People argue that the trial court's application of an incorrect legal standard for determining whether Clapps acted under the heat of passion was harmless because, when the correct standard is applied, there is comparatively weak evidence to support a heat of passion finding. As we will explain, we are not persuaded.

Under the standard that the trial court should have applied in assessing the issue of objectively sufficient provocation, the inquiry is "whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment." (CALCRIM No. 603.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) We focus our harmless error analysis on the relative strength of the evidence to support a

16

finding that Clapps acted with objectively sufficient provocation under this legally correct standard.

Although Clapps and Jeremy offered differing accounts of the altercation that led to the stabbing, it is undisputed that the two men had known each other for years and had once lived together as foster brothers. It is further undisputed that the two men were in Jeremy's apartment because Clapps was trying to rectify his failure to return with the marijuana for which Jeremy had paid. Clapps explained that, in his view, he was "going out of [his] way to be a good man and a righteous man." By all accounts, the two men were having a friendly visit and smoked marijuana together when Jeremy abruptly told Clapps that he had to leave the apartment. Jeremy did not detail all of the words he used in telling Clapps to leave, but according to Clapps, Jeremy repeatedly used profanity. As Clapps testified, after Jeremy pushed him several times, Jeremy said "Get the fuck up out of my house, little nigga, before I kill you." Clapps explained that he became "angry" when Jeremy walked up to him, pushed him, and used profanity in telling him to leave. Clapps said he was "stunned, shocked and surprised."[14] Clapps's testimony supports a finding that he was subjectively provoked, but our focus is on the strength of the evidence to support a finding that Clapps's angry and emotional response to the situation is, as an objective matter, the type of response that a person of average disposition would have experienced.

"[W]ords of abuse, insult or reproach may incite the heat of passion . . . and hence may constitute sufficient provocation to reduce the offense of intentional homicide from murder to manslaughter." (*People v. Le* (2007) 158

[14] The trial court gave no indication in its comments whether it believed or disbelieved Clapps's testimony, and at one point in its comments, when discussing the self-defense issue, the trial court stated it was "assuming facts most favorable to Mr. Clapps."

Cal.App.4th 516, 526.) Here, not only did Jeremy make statements that Clapps could reasonably perceive as insulting in the context of a friendly visit where he was trying to be "a good man and a righteous man," but Jeremy also used physical violence toward Clapps in the form of repeated shoving and attempts to punch him. Jeremy's insulting behavior toward Clapps, combined with his physical aggression, is the type of provocation that could reasonably be found to be sufficient, on an objective basis, to give rise to heat of passion. (*People v. Elmore* (1914) 167 Cal. 205, 211 [the evidence showed a knife wound during a barroom altercation was "without legal malice and solely as the result of the sudden heat of passion excited in [the defendant] by the unprovoked attack and violent blows of [the victim]," whom the defendant was trying to stop from inflicting abuse on an elderly man]; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1141-1143 [evidence supported a heat of passion instruction where, during a party, the victim engaged in a heated argument with the defendant's girlfriend, engaged in belligerent and threatening behavior, and then clenched his hands and lunged at the defendant immediately before the defendant shot him]; *Beltran, supra,* 56 Cal.4th at p. 946 [stating that " 'angry and sudden assaults upon one' " constituted adequate provocation at common law]; cf. *People v. Manriquez* (2005) 37 Cal.4th 547, 585 [in a case where there was no prior physical altercation between the defendant and the victim, evidence that the victim insulted the defendant by calling him a " 'mother fucker' " and taunted him to take out a weapon immediately prior to the shooting was not substantial evidence of provocation to support a heat of passion instruction].)

A person of average disposition who is trying to have a friendly visit with someone he has known for years could become angry and react rashly, without reflection, when his host suddenly turns on him, abruptly uses

18

profanity in telling him to leave, pushes him several times, tries to punch him, and threatens to kill him. Although the trial court was not required to conclude, based on the facts presented at trial, that a person of average disposition would have reacted from passion rather than judgment, in our view, it is reasonably probable that, had the court applied the correct standard, it would have reached that conclusion.

Accordingly, even assuming for the sake of our analysis that the trial court's error in applying an improper legal standard when delivering its decision during the bench trial is subject to harmless error review, we conclude that the trial court's error was prejudicial and requires that we reverse Clapps's conviction for attempted murder.[15]

---

[15]    Because we reverse the conviction for attempted murder based on the trial court's application of the incorrect legal standard for heat of passion, we need not, and do not, consider whether the trial court's comments also establish error with respect to the issue of imperfect self-defense.

DISPOSITION

We reverse Clapps's conviction for attempted murder, and we affirm in all other respects. This matter is remanded for proceedings consistent with this opinion.

IRION, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.